STATE OF NORTH CAROLINA v. RYAN MARCUS KIRBY

No. COA09-1631

(Filed 17 August 2010)

**1. Homicide— second-degree murder—motion to dismiss— self defense**

The trial court did not err by denying defendant's motion to dismiss a second-degree murder charge where defendant had contended that he acted in self-defense. The evidence presented at trial (of an earlier altercation, defendant arming himself and looking for the victim, the size disparity between defendant and the victim, the physical evidence, questions about the credibility of defendant's witnesses, and defendant's flight after the shooting) was sufficient to allow a reasonable juror to infer that defendant was the aggressor.

**2. Evidence— prior crimes or bad acts—selling drugs**

The trial court properly admitted evidence in a homicide prosecution that defendant had been selling drugs in the area where the shooting occurred on the day of the shooting. The evidence was relevant to refute defendant's claim of self-defense.

Appeal by defendant from judgment entered 17 April 2009 by Judge Carl R. Fox in Wake County Superior Court. Heard in the Court of Appeals 12 May 2010.

*Attorney General Roy Cooper, by Assistant Attorney General W. Wallace Finlator, Jr., for the State.*

*Sofie W. Hosford for defendant appellant.*

HUNTER, JR., Robert N., Judge.

Ryan M. Kirby ("defendant") appeals his conviction of voluntary manslaughter for which he was sentenced to a term of 69 to 92 months' imprisonment. On appeal, defendant asserts that (1) the trial court erred by denying defendant's motions to dismiss the charge of second-degree murder for insufficient evidence that defendant did not act in self-defense; and (2) the trial court erred by allowing the State to ask defendant on cross-examination if he had been selling

---

1. Defendant also asserts in his reply brief that the State's argument contains assertions not in the record. Since we do not rely on these assertions to make our decision, we decline to address them.

drugs in the area earlier in the day prior to the shooting.[1] After review, we conclude that the trial court did not err.

## I. FACTUAL BACKGROUND

On 1 November 2007, defendant was involved in a shoot-out on South Street in Raleigh, North Carolina, with Joseph Dunn ("Dunn") resulting in his death. Defendant was charged with second-degree murder. Defendant entered a plea of not guilty and was tried before a jury on 13 April 2009.

At trial, the State's evidence tended to show the following: Chris Braswell ("Chris") testified that he was walking up the street when he heard a lot of hollering and cussing from the area behind him on South Street. Chris observed that the source of the commotion was located in front of a little store on South Street and involved defendant and Dunn. Although Chris did not witness the shooting, he testified that "the shorter man appeared to have a gun and was pointing it at the bigger man." After hearing gunshots, Chris called 911.

Officer Charlie Jacobs ("Jacobs") of the Raleigh Police Department responded to the call which reported a shooting on South Street in Raleigh, North Carolina, at 2:00 p.m. on the afternoon of 1 November 2007. Upon arriving at the scene, he found Dunn lying down beside the curb. Jacobs witnessed Dunn as he took his last breath and died. Jacobs did not see a gun in the vicinity of Dunn; however, he did see a black ski mask with a little face on it beside the victim.

The State also presented the testimony of Francis Manachino, ("Manachino"). Manachino said that he saw two men, one standing behind the other. Manachino testified that defendant was wearing a heavy coat and had Dunn in a half nelson in complete submission. He also stated that he believed that it was clear that Dunn, given his smaller frame and submissive position, could not retaliate while in a half nelson. Manachino testified that he made eye contact with defenant, but that he became afraid and looked away. A second later, he heard six gunshots. While he did not witness the shooting itself, Manachino testified that after the shooting, he saw Dunn lying lifeless on the ground. Manachino also stated that he recognized Dunn as the smaller man who had been held by defendant in a half nelson moments earlier.

Danny Weston ("Weston") testified that on the afternoon of 1 November 2007, he was working a roofing job on South Street. While talking to his boss about the job, Weston heard gunshots. Weston

threw himself onto the ground underneath a truck. From this vantage point, he saw defendant picking up cartridges off the ground. Weston testified that defendant had a heavy coat on and a hood over his head with fur lining. After defendant had picked up the cartridges, he ran toward a nearby convenience store.

Mary Williams Ellison ("Ellison") testified that on 1 November 2007, she was at her home across the street from the scene of shooting, watching a movie, when she heard arguing. When Ellison looked out the window, she saw Dunn and defendant yelling at each other. Ellison testified that the men argued for approximately five to six minutes about a woman. During the argument, Ellison heard Dunn say to defendant, "Whatever. She was with me last night. So she was with you. You ain't the only one that she was with." Then she saw Dunn walk off towards South Street. Ellison testified that there was another person with defendant, but that Dunn was alone. After Dunn walked away from defendant, Ellison witnessed defendant go into a house located at 518 West Lenoir Street next door to the crime scene, then come back out and open up the trunk of a car and retrieve a black coat with a hood and orange lining inside. Ellison further testified that she saw defendant walk toward South Street and that she heard gunshots a few minutes after defendant walked off. After hearing the shots, Ellison walked in the direction of the gunshots and saw Dunn lying on the ground. Ellison testified that she never saw Dunn with a gun. After returning to her house, Ellison saw defendant and an unnamed man running from South Street where the shooting had taken place. At this time, she heard the unnamed man say to defendant: "Yo, yo, man, you need to go ahead and get on out of here." Ellison heard defendant say, "I'm about to be out" as he was running away.

Dr. Thomas Clark, the forensic pathologist who performed the autopsy on Dunn, testified that there were two gunshot wounds present on Dunn's body. The first wound was located behind the right side of the head above the ear. Dr. Clark testified that the bullet that inflicted the first wound entered Dunn's head causing damage to the brain. Dr. Clark testified that the first gunshot wound caused Dunn's death. In addition, Dr. Clark testified that the second bullet entered the right side of Dunn's upper chest, fractured Dunn's clavicle, and caused physical damage, but absent the gunshot wound to the head, this shot would not have resulted in death.

Furthermore, firearms examiner and Special Agent Beth S. Desmond of the North Carolina State Bureau of Investigation, testi-

fied that she received the evidence from the 1 November 2007 crime scene. This evidence included a .38 revolver which was recovered from an ivy bush at a drug house, two live rounds, four fired cartridge cases, two fired .380 cartridge cases, and two fired bullets. Agent Desmond testified that the two fired .380 cartridge cases could not have been used in a .38 revolver. However, Agent Desmond further determined that the two bullets taken from Dunn's body were fired from the .38 revolver found at the crime scene. Moreover, gunshot residue testing of the .38 revolver compared to residue found on Dunn revealed that Dunn had either fired a firearm, handled a discharged firearm, or was near a firearm that had been recently fired. However, it could not be definitively determined that Dunn had fired a weapon. Residue testing also found gunshot residue on a North Face jacket that was recovered from defendant.

In addition, Detective Timothy Fanney ("Fanney") investigated the house at 519 West Lenoir Street where Mary Ellison testified that she saw defendant and the unnamed man after the shooting. Fanney described the house as a "drug house" and noted that investigators found a small amount of marijuana and crack cocaine in the house. On a footpath near the house, Fanney found the .38 caliber gun in an ivy bush near the "drug house." The gun contained four fired shells in the cylinder and two unfired shells. Fanney advised that a revolver does not eject shotgun shells, but noted that the .38 caliber revolver smelled as though it had been recently fired. Fanney also testified that investigators found a cell phone inside the "drug house" with the name "Kirb" displayed on the face. Fanney further noted that examination of latent fingerprints on the gun indicated that defendant had touched the .38 caliber revolver, which was collected by Fanney as evidence at the crime scene.

Law enforcement officers located defendant approximately three hours after the shooting. After being taken into custody and read his *Miranda* rights, defendant was questioned by Detective Robert LaTour. Defendant told LaTour that Dunn approached him and began to argue with him about a girl named Shameka. Defendant also said that he felt disrespected by Dunn because he was wearing a "Scream" mask with red on it, like blood, because defendant was a member of the Blood gang and Dunn was a member of the Folk gang.

About 10 minutes after defendant's argument with Dunn, defendant stated that he and a friend walked to a nearby convenience store to purchase a soft drink. At this time, defendant took a gun out of

what he referred to as a "stash." Defendant stated that he brought the gun with him because he knew that the Folk gang, of which Dunn was a member, was known for robbing people, and if something happened, he wanted to be able to protect himself. Defendant also told Detective LaTour that, while en route to the store, Dunn approached him and said that the boss of the Folk gang did not want defendant around their territory anymore. In response to Dunn's remark, defendant told Detective LaTour that he stated to Dunn that the Folk gang could not tell him what to do. Detective LaTour testified that defendant told him that as he turned around and started to walk away from Dunn, Dunn grabbed defendant from behind with his left arm. Defendant further told Detective LaTour that Dunn ordered him to show his hands, held a gun to defendant's head, and stated that he was going to kill defendant. At this point, defendant pulled a gun out of his pocket with his right hand, switched it to his left hand, spun around, and he and Dunn both fired their guns. Defendant told Detective LaTour that after he saw Dunn fall to the ground, he ran to West Lenoir Street where he threw his .38 caliber revolver into a vacant lot. Defendant, subsequently, ran to his car and drove away from the scene alone.

Detective LaTour noted that defendant signed his *Miranda* form with his right hand and testified that defendant had identified himself as right-handed in the past. However, during his interrogation, defendant stated that, although right-handed, he shoots with his left hand. Detective LaTour also made a photographic lineup that included defendant and his friend Keenan Henderson ("Keenan"). Keenan was positively identified by Ellison as the person who was with defendant on the day of the shooting.

During defendant's case, defense counsel argued and presented evidence that defendant shot Dunn in self-defense. Keenan testified on defendant's behalf. During his testimony, he stated that he and defendant were together at 519 West Lenoir Street on the day of the shooting. Keenan further testified that Dunn approached defendant and began to argue with him about a female.

Approximately fifteen minutes after the argument, Dunn approached Keenan and defendant as they were walking to the store. Dunn and defendant began arguing again, at which point Keenan stated that he walked away from the two men. Keenan testified that while his back was turned away from the men, he heard the sound "clink, clink," whereupon, he turned around and saw Dunn standing

STATE v. KIRBY

[206 N.C. App. 446 (2010)]

behind defendant holding a gun to defendant's head. Dunn held defendant in a choke hold with his left arm and held the gun to the right side of defendant's head. Keenan stated that Dunn and defendant argued for approximately five minutes before defendant jerked away from Dunn and the men began firing their guns. Keenan stated that he heard about five gunshots while running back to the 519 West Lenoir Street house.

Sheena Alford ("Alford") also testified on defendant's behalf that she saw Dunn grab defendant and put a gun to his head, at which point, shots were fired and she ran home. Alford also testified that she did not speak with police about what she had seen.

Finally, defendant took the stand in his own defense. Defendant testified that Keenan approached him on the day of the shooting and stated that Dunn wanted to talk to him about a female. Defendant replied that he did not want to argue about a female and went back inside the house. Defendant further testified that approximately 10 to 15 minutes later, he and Keenan went to the store on South Street, around the corner from the 519 West Lenoir Street house. While leaving the store, defendant noticed Dunn walking toward him. According to defendant, Dunn approached him and asked, "So what are we going to do, beef or make money?" To which defendant walked away from Dunn and responded, "Man, are you still on that crazy stuff," and "Man, forget that." Then, defendant stated that he heard the click of a gun, and Dunn grabbed defendant from behind with his left arm and placed the gun to his head. Defendant testified that at this point, he started to pray while Dunn was threatening to kill defendant. However, defendant testified that he remembered that he had a gun when Dunn demanded that defendant show his hands. At this point, defendant took his gun out of his right pocket and the men began to shoot at each other. Defendant testified that he shot Dunn twice before running away from the scene. Defendant further stated that Dunn was still shooting at him while defendant was running away. Moreover, defendant testified he shot Dunn only because he believed Dunn was going to kill him.

During the State's cross-examination, defendant admitted that he kept a gun hidden in a vacant lot and stated that he had retrieved his gun and placed it in his North Face jacket prior to walking to the store. Defendant also admitted that he was a member of the Blood gang and had been selling drugs earlier in the day in the vicinity of the shooting. He further asserted that he was both taller and weighed

twice as much as Dunn. Finally, defendant admitted that, after the shooting, he threw his gun in the woods and did not call 911 for help or to report the incident to police.

After the close of the evidence, the jury, after being properly instructed by the trial court, returned a verdict of voluntary manslaughter. The trial court sentenced defendant to 69 to 92 months' imprisonment. Defendant gave timely notice of appeal. This Court has jurisdiction to review defendant's appeal as it is an appeal as of right from a final judgment of the Wake County Superior Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2009).

## II. CONTENTIONS ON APPEAL

On appeal, defendant asserts the following assignments of error: First, he asserts that the trial court erred by denying his motion to dismiss the charge of second-degree murder based on a contention that the State's evidence was insufficient to refute defendant's evidence of perfect self-defense. Secondly, defendant argues that the trial court incorrectly admitted irrelevant evidence that defendant had been selling drugs earlier on the day of the shooting.

### III. Motions to Dismiss for Insufficiency of Evidence

[1] Defendant contends that the trial court erred by denying his motion to dismiss the charge of second-degree murder and asks this Court to vacate his conviction of voluntary manslaughter on the ground that he acted in self-defense. For the reasons stated below, we disagree and affirm the trial court's denial of the motion.

In ruling on a motion to dismiss for insufficiency of evidence, the trial court need only determine "whether there is substantial evidence of each essential element of the crime and that the defendant is the perpetrator." *State v. Call*, 349 N.C. 382, 417, 508 S.E.2d 496, 518 (1998). This Court applies *de novo* standard of review when considering whether the State presented substantial evidence to establish each element of the offense and demonstrate that defendant was the perpetrator. *State v. Hart*, 179 N.C. App. 30, 39, 633 S.E.2d 102, 108 (2006), *reversed on other grounds*, 361 N.C. 309, 644 S.E.2d 201 (2007).

In considering a motion to dismiss, the trial court must consider all evidence in the light most favorable to the State and give the State the benefit of every reasonable inference that can be drawn from the evidence. *State v. Primes*, 314 N.C. 202, 333 S.E.2d 278 (1985). Also, in determining if the evidence in question is substantial, the State must

only establish that a reasonable mind might find the evidence adequate to support a conclusion. *State v. Burton*, 108 N.C. App. 219, 224, 423 S.E.2d 484, 487, *disc. review denied*, 333 N.C. 576, 429 S.E.2d 574 (1993).

In the case at bar, defendant does not dispute that he shot Dunn, nor does he argue that the State has failed to prove the elements of voluntary manslaughter. Instead, defendant asserts that he was justified in his actions based on his contention that he was completely justified in killing Dunn because he acted in perfect self-defense. A person acts in perfect self-defense where the following elements are supported by the evidence:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and

> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at that time were sufficient to create such a belief in the mind of a person of ordinary firmness; and

> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and

> (4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. McAvoy*, 331 N.C. 583, 595, 417 S.E.2d 489, 497 (1992).

To negate a claim of self-defense, the State need only prove beyond a reasonable doubt the non-existence of either of the first two elements. For example, the State must prove that either defendant had no belief that it was necessary to kill the deceased in order to escape death or great bodily injury, or that such belief was unreasonable because the circumstances as they appeared to defendant were insufficient to create such a belief in the mind of a person of ordinary firmness. *State v. Reid*, 335 N.C. 647, 670-71, 440 S.E.2d 776, 789 (1994). "To survive a motion to dismiss, the State must therefore present sufficient substantial evidence which, when taken in the light most favorable to the State, is sufficient to convince a rational trier of fact that defendant did not act in self-defense." *State v. Ammons*, 167 N.C. App. 721, 726, 606 S.E.2d 400, 404 (2005).

Considering only the undisputed facts in the case, it is reasonable that a jury could infer that defendant did not kill Dunn in self-defense, but rather armed himself with a .38 revolver and went looking for Dunn in order to settle an altercation over a female that began earlier in the day. For instance, the State presented eyewitness testimony from Mary Ellison which tended to show that defendant and Dunn were involved in an argument. Ellison further testified that she saw Dunn walk off, thus separating himself from the altercation. Subsequently, Ms. Ellison saw defendant go into the house at 518 West Lenoir Street, come back out and take a black coat out of a car in front of the house and walk toward South Street, which was in the same direction that Dunn had walked minutes earlier.

Defendant, on the other hand, testified that he was merely going to the store to purchase a soft drink with Keenan. However, defendant admitted that he retrieved his gun before going to the store and put it in his North Face jacket to conceal it. Based on these facts alone, it is reasonable to infer that defendant was preparing for a violent altercation with Dunn when he armed himself with a .38 caliber revolver and subsequently walked in the same direction as Dunn. As such, the evidence presented during trial, taken in the light most favorable to the State, was sufficient to convince a rational trier of fact that defendant did not act in self-defense.

Moreover, taken in the light most favorable to the State, it is reasonable to conclude that Dunn may not have intended to engage in a fight with defendant. Although defendant testified that Dunn grabbed him from behind and held a gun to his head, the State presented the testimony of Manachino, who testified that he saw a big man wearing a heavy coat holding a smaller man in front of him in a half nelson and in complete submission. The State's evidence further showed that Manachino told Detective LaTour that the bigger guy was about five feet eleven inches in height and was wearing a puffy, parka-style jacket. Manachino also testified that the smaller guy had dread locks and was about six inches shorter that the bigger male. The State presented the testimony of Detective LaTour that on the night he interviewed defendant, defendant was approximately six feet one or two inches in height and weighed approximately 275-280 pounds. Given that Manachino was close enough to hear an exchange between Dunn and defendant, which he gave in a statement to Detective LaTour, it is logical for the jury to infer that he was close enough to accurately perceive the significant size disparity between defendant and Dunn.

The physical evidence presented by Dr. Clark tended to show that the gunshot wound that killed Joseph Dunn was located behind the right side of the head above the ear. This location is consistent with being shot from behind by a taller man holding a gun with his right hand. In addition, defendant told the jury he shot Joseph with his left hand. However, Detective LaTour told the jury that he noticed that defendant used his right hand when he signed his *Miranda* form and noted that defendant had previously identified himself as right-handed in past records.

After reviewing the transcript, it appears that defendant's witnesses' credibility was called into question numerous times throughout the trial. For instance, defendant presented two witnesses, Keenan and Shenna Alford, who claim to have witnessed the shooting and both of whom state that Dunn grabbed defendant from behind and put a gun to his head. However, we note, based on the State's cross-examination of the witnesses, that both witnesses were clearly defendant's friends and that neither witness called 911 or reported the incident to authorities. Moreover, Detective LaTour testified that during his interview, Keenan initially denied being present at the scene of the shooting, but later admitted to being at the scene. Witness credibility is an issue for the jury, and based on the aforementioned evidence, it is reasonable to infer that the jury could question the veracity of Keenan's and Alford's statements during trial.

In addition, based on our Supreme Court's ruling in *State v. Watson*, 338 N.C. 168, 181, 449 S.E.2d 694, 702 (1994) *(overruled on other grounds, State v. Richardson*, 341 N.C. 585, 461 S.E.2d 724 (1995)) (holding that flight permits a jury to reasonably infer that the defendant harbors a sense of guilt inconsistent with a killing justified by self-defense), defendant's conduct after the shooting could have led the jury to reasonably infer that defendant did not shoot Dunn in self-defense. Defendant fled the scene and threw the .38 caliber revolver into a nearby field immediately after shooting Dunn. Defendant's flight after the shooting is clear evidence from which the jury could reasonably infer that defendant knew that he had not killed in self-defense, otherwise he would have stayed and waited for the police to come, or he would have called the police himself.

Moreover, the physical evidence presented at trial showed that four bullets were fired from defendant's .38 revolver, but that defendant testified to the jury that he only fired twice. The evidence further showed that defendant told Detective LaTour that he retrieved the .38

revolver from a hidden "stash" immediately before walking with Keenan toward South Street; however, defendant told the jury he had been carrying the gun all day. The issue of defendant's credibility is one to be determined by the jury. It is reasonable given the inconsistency of defendant's statements with the evidence in the record, that the jury simply did not believe defendant's version of events.

Defendant contends that his motion to dismiss should have been granted because the State's evidence was sufficient only to raise a mere suspicion that defendant committed the offense, but did not negate that he acted in self-defense. Defendant's contention is not supported by the record. The State presented witness testimony, along with physical evidence, that was clearly sufficient viewed in the light most favorable to the State to survive defendant's motion to dismiss. In fact, the evidence presented was sufficient to allow a reasonable juror to infer that, far from being the victim, defendant could have been seen as the aggressor given his conduct before and after the shooting. As such, the trial court properly denied defendant's motion to dismiss because there was sufficient evidence presented to establish the elements of the crime, and it could be reasonably determined that defendant was not acting in self-defense.

## IV. RELEVANCE OF EVIDENCE THAT DEFENDANT SOLD DRUGS PRIOR TO SHOOTING DUNN

[2] Defendant next contends that the trial court erred by admitting allegedly irrelevant evidence that defendant had been selling drugs in the vicinity of the shooting on 1 November 2007. We disagree.

Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." N.C. Gen. Stat. § 8C-1, Rule 401 (2009). Whether evidence is relevant is a question of law, thus we review the trial court's admission of the evidence *de novo. See State v. Hightower*, 168 N.C. App. 661, 667, 609 S.E.2d 235, 239, *disc. review denied*, 359 N.C. 639, 614 S.E.2d 533 (2005). Defendant bears the burden of showing that the evidence was erroneously admitted and that he was prejudiced by the error. N.C. Gen. Stat. § 15A-1443(a) (2009); *State v. Moses*, 350 N.C. 741, 762, 517 S.E.2d 853, 866-67 (1999).

Defendant argues that, even if the evidence is deemed relevant, it should have been excluded under N.C. Gen. Stat. § 8C-1, Rule 403 (2009). North Carolina Rule of Evidence 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substan-

tially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

In the case at bar, the evidence presented at trial tended to show that both defendant and Dunn were members of gangs in the area. The State presented evidence by Manachino, who testified to seeing a bigger man, who can be reasonably inferred to be defendant, peddling drugs earlier in the day. Defendant claims that the State's cross-examination of him with regard to his gang affiliation and drug dealing was meant solely to be unfairly prejudicial and disparage him in the eyes of the jury.

However, a trial court's ruling will be reversed on appeal "only upon a showing that the ruling was so arbitrary that it could not have been the result of a reasoned decision." *State v. Jones*, 347 N.C. 193, 213, 491 S.E.2d 641, 653 (1997). Demonstrating gang affiliation and the selling of illegal drugs is clearly relevant to show that defendant could have had a different objective in mind when the altercation took place and could refute defendant's claim of self-defense. Defendant presents no evidence that this is not a reasonable conclusion and that the trial court abused its discretion in any way. Consequently, defendant's assignment of error is without merit, and the trial court did not err.

## V. CONCLUSION

For the reasons stated herein, we conclude that the trial court did not commit error by denying defendant's motion to dismiss the charge of second-degree murder based on defendant's contention that he acted in perfect self-defense. Moreover, we conclude that the trial court properly admitted evidence that defendant had been selling drugs on 1 November 2007 in the area where the shooting occurred. As such, we hold that defendant received a fair trial, free of prejudicial error.

No error.

Judges McGEE and STROUD concur.