An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA 15-111

Filed: 20 October 2015

Buncombe County, Nos. 13 CRS 54632, 13 CRS 452

STATE OF NORTH CAROLINA,

v.

DANRAS DAMOY BUNSIE, Defendant.

Appeal by Defendant from judgments dated 7 November 2014 by Judge Marvin P. Pope in Buncombe County Superior Court. Heard in the Court of Appeals 27 August 2015.

> *Attorney General Roy Cooper, by Assistant Attorney General Scott A. Conklin, for the State.*
>
> *Massengale & Ozer, by Marilyn G. Ozer, Attorney for Defendant-Appellant.*

HUNTER, JR., Robert N., Judge.

Danras Bunsie ("Defendant") appeals from a jury verdict convicting him of assault with a deadly weapon inflicting serious injury and voluntary manslaughter. Defendant was sentenced to consecutive sentences of 60 to 80 months imprisonment for voluntary manslaughter and 23 to 40 months for assault with a deadly weapon inflicting serious injury. Defendant contends the trial court erred in denying Defendant's motion to dismiss the charge of second-degree murder and gave

erroneous jury instructions. For the following reasons, we find no error and affirm the trial court's judgment.

## I. Factual and Procedural History

On 2 December 2013, a grand jury indicted Defendant for second-degree murder[1] and assault with a deadly weapon with intent to kill. The State filed a motion to join the charges which was allowed. In November 2014, Judge Marvin P. Pope presided over Defendant's trial. Defendant plead not guilty to both charges. The State's evidence at trial tended to show the following.

The State's first witness was Elliott Green ("Green"). Green introduced himself and then described his view of the events of 28 April 2013. At approximately 2 a.m. that night, Defendant and two young women, Briana Houston ("Houston") and Alexis Aalborg ("Aalborg"), stood near Defendant's car in the parking lot of Barcade, an Asheville nightclub. After celebrating a birthday, Green and five of his friends left Barcade as it was closing.

> [We all left together] and started going towards the parking lot, and that's when I saw them at the car. . . . Three people; [Defendant] and two ladies. I recognized [Houston]. I've seen her around high school, and that's about it. She used to ride the bus with me on my way to school. I spoke to her and asked what she was doing downtown tonight. She was real young.

---

[1] The indictment for second-degree murder states, "The jurors for the State upon their oath present that . . . defendant . . . unlawfully, willfully, and feloniously and of *malice aforethought* did kill and murder Travis Rahsaan Schoon." This Court notes that first-degree murder, not second-degree murder, requires a premeditated killing. N.C. Gen. Stat. § 14-17 (2014).

Green's friends, all men, followed him and stood nearby as he spoke with Houston. Defendant did not participate in the conversation until he approached Green and said, "Get the f--- away from my car." Green testified:

> I was exchanging words with him first, and somebody else exchanged words, and the whole mess started. We started to walk away, and Giovonne [Dubon] and him got in the middle of the street right there and the whole mess started with the weapon and everything. [Defendant had a] long knife. As they were standing there toe-to-toe fighting one-on-one I saw a weapon. And [Dubon] turned his body. And if he hadn't turned, he probably would have died as well.

As they were arguing, others leaving the local bars and nightclubs gathered into a crowd about the debaters.

The next morning at trial, the State called Dubon as a witness. Dubon, an assistant manager at Foot Locker, introduced himself and described his confrontation with Defendant.

> He basically — like he was in a position to where he was a threat. I stood my ground and he was pushing at me, like he had one hand behind his back and he kept bucking at me. I stood my ground. . . . He lunged at me with a knife . . . [I] felt it. It was long. . . . [The knife struck] my chest. Right down the middle. . . . [My] gold chain basically stopped the knife from riding down my chest.

Defendant then got into his car and began to drive away. In shock, Green and Dubon ran from the scene. Dubon explained:

> And then after that — after I told everybody that he tried to take my life, everybody got really upset and they ran back toward [Defendant], and I ran back — and I was right

there in the middle. A group of people had surrounded him. There was one guy that was basically like — like they were standing next to each other, basically. I don't know what was going on, but I saw . . . him stab the other guy, basically. . . . Actually, when that happened I saw two swings and it broke the knife — the knife broke out of his hand. I heard it hit the floor. When it hit the floor he ran down that way and everybody that I was with ran right behind him. [Nobody was able to catch him.]

Dubon sought medical care at a hospital a few hours later. The stab wound required eleven stitches.

The State also called upon Onail Walker ("Walker") to testify. Walker introduced himself as a friend of Travis Schoon's. On the same night, Walker and his friends, Travis Schoon ("Schoon"), Deandre Gartley ("Gartley"), and Ryan Scurry ("Scurry"), went to a party in downtown Asheville. After leaving a private party next to Barcade at the time of Dubon's stabbing, they walked through the parking lot to their car. Defendant, fleeing the scene of his fight with Dubon, nearly hit Walker and his friends. Walker testified, "he almost backed into us right here. We said, 'Hey, man, watch what you're doing.' He said, 'Get out of the way.'"

Deandre Gartley, one of Walker's friends, introduced himself and testified as follows.

We were going home, and we was coming around this way and go through this parking lot there to go where we was parked at . . . All of us was walking through here and a car was coming behind us and he said, "You all better get out of the way before I run your-all's ass over."

Walker and his friends continued toward their car while Defendant drove alongside them.

Schoon and Defendant started arguing with each other. Defendant stopped the car and got out. Gartley described the confrontation:

> [Defendant] was a short, black male. At first I could not see his face, but [Scurry] was telling him to get back in the car and go ahead. And they stood there arguing . . . And then we got probably right in this way and then I seen something in his hand that was silver, so me and [Walker] was blurting it out like, "Something was in his hand." I guess [Schoon] didn't see it. . . . He was going towards [Schoon]. And I don't know what he was doing, but he was trying to block whatever he had. He was falling back and [Scurry] had caught him, and that's how we know he had done something to his chest and he had ran off. A couple of guys start chasing him and then I started chasing down this road . . . around this corner and I didn't see him after that.

Kelly Derby, a nurse, introduced herself to the jury and continued with her view.

> I went out with friends to be the designated driver, and we were at the last place in a parking lot. . . . We were standing outside talking, waiting, and I heard people arguing and I heard, "Hey, man, you can't hit a f---ing girl," and there were people screaming back and forth. I couldn't understand what they were saying. And then all of a sudden I heard, "Oh, my God, he f---ing stabbed him," and I heard a loud clink and I just turned around and went over to the scene where this guy was laying on the ground.

Derby checked Schoon's body for wounds as he gasped for air.

> I just saw blood. I thought he had hit his head from the

> clinking noise. I started checking for a pulse and he was just gasping for air and I could not find a pulse . . . I listened for air. There was no air coming through, so I started to do CPR, and when I started pushing his chest there was a volcano of blood. It kept coming. I just held his hand because I knew there was nothing I could do other than just stay with him.

Derby remained with Schoon until police arrived.

Officer Brad Butterfield of the Asheville Police Department was the first officer on the scene. He testified as follows.

> There was a large crowd. There was one black male on the ground. There was people on the sidewalk, people in the roadway, and I pulled up and stopped in the middle of the street. They were yelling and cursing. . . . I could see he was still breathing and moving his arms, but I couldn't see any injuries immediately apparent. I told Communications he was in and out of consciousness. . . . And then I asked for an ambulance. And the next step I did was people were telling me who the suspect was. I still didn't know if he was on scene or not. They gave me a description. I radioed it in. They told me the murder weapon was right there. I told no one to touch it.

An ambulance arrived for Schoon. Emergency medical personnel attempted to save his life, but the attempt was unsuccessful. Dr. Donald Jason performed an autopsy on Schoon, finding that the stab wound penetrated Schoon's heart, killing him.

The State rested. Defendant made a motion to dismiss at the close of the State's evidence. The court denied Defendant's motion. The trial court questioned

Defendant to ensure he understood the right to testify or not testify on his own behalf at trial.

Defendant presented evidence beginning with the testimony of Alexis Aalborg ("Aalborg"). Aalborg introduced herself as a friend of Defendant's. She was dating Defendant, and had been dating him for "some time" on 28 April 2013. Aalborg said she, Houston, and Defendant were in a parking lot in downtown Asheville. She described what happened as a group of men, later identified as Dubon and his friends, the first group, approached them:

> I thought they were hitting on [Houston] and I went to see what they were talking about . . . I would say it was like playful at first, but it was kind of like we were trying to get them to leave . . . And then that's when it got more — not ugly, but like tense. They wouldn't leave. They just wanted to argue. I don't know. They were drunk — they were argumentative and trying to state their manhood, I guess, by attempting to not let anyone tell them what to do. . . . [Defendant]said, "Let's go, guys," as talking to me and [Houston], and then telling them, "Y'all need to leave" . . . [Defendant] has a thick accent and some people can't understand, so I think they just assumed he was saying something negative when he wasn't . . .

Aalborg testified that there was an argument, but it was not physical. She did not mention a knife or a stabbing on direct examination. Aalborg described Defendant's altercation with the second group of men:

> We never got a chance to drive through the [parking] lot. We backed up, and that's when the second group came into the picture, and then that's when the physical fighting came and [Defendant] got pulled out of the car [by Schoon],

and [Schoon] was mad . . . The next group of people would
be the aggressors in my opinion.

Aalborg tried to get in-between the two men to prevent a fight. When she was between them, she said, "[Schoon] hit me in the face." Aalborg explained, "[Schoon] was swinging the entire time . . . He was swinging so continuously he didn't realize when he was not hitting [Defendant] or the person he was trying to have a fight with." Aalborg did not see whether Schoon wore brass knuckles. She did not see Defendant stab Schoon because she was "turned around." She witnessed Schoon falling to his knees and Defendant running from the scene.

Defendant, testifying on his own behalf, introduced himself to the jury. Defendant described the events of 28 April 2013. He went to a club in downtown Asheville with Houston and Aalborg to see his friend, Andrew Williams ("Williams"). Houston waited in the car outside and Aalborg waited for him by the club's entrance. Defendant went into The Aqua Lounge to look for Williams, who is a DJ at that club. He looked around, but was unable to find his friend. Since he was unable to find him, Defendant went to the door where Aalborg was waiting for him to leave the club.

As Defendant and Aalborg walked from the club toward the car, Defendant said people were "looking at me saying stuff . . . people always say stuff to me. I kept my head straight and kept walking to the car." When Defendant got to the car, Houston was talking on her cell phone. Defendant and Aalborg were kissing because

Aalborg was mirthful that night. While they were kissing, Defendant realized he did not have his phone. Defendant testified:

> . . . I went to the passenger's side, if I remember right, and kneeled down looking through the car for the phone, and then I think I did find the phone. I found the phone. I got up. I looked around. I see a bunch of dudes around the car. I'm like, "What's going on," startled like . . . I'm startled. I don't know what's going on. People are approaching me and stuff. So I told [Aalborg] and [Houston] to get in the car so we can leave.
>
> I was planning to drive because [Aalborg] was drunk . . . I was trying to get through the little crowd to get to the driver's side. I couldn't.

The men in the crowd called Defendant names "because the way I dress, colorful names: 'Fruity,' 'Faggot.' And just because whenever I talk, my accent comes out strong. 'Go back to Jamaica where you came from.'" Defendant asked them to leave him alone. Defendant called a friend and said, "Come pick me up. People are going to beat me up."

> I got in the car in the passenger's side and Aalborg backed the car up and almost hit a group of people. "Hold on, man." They're cussing and stuff. We kept on going. She stopped and drove forward. We got to the exit. There was a lot of people at the exit, so we couldn't get through. I don't know if people had saw what happened or whatever, but I think it's because the clubs were letting out. That's why there was so much people out there. We was there for a minute and [Aalborg] is beeping the car. We trying to leave.

Defendant said he had no physical altercation with Dubon. He testified, "I did not touch him and he did not touch me."

Aalborg got out of the car. Defendant got in the driver's seat and told her to get back in the car, which she did. Defendant explained:

> We were trying to leave. Beep, beep, "Get out of the way. Get out of the way, "beeping the car horn. And then all of a sudden there's a jacket on the windshield and I'm like, "What's going on?" And my car door was opened and somebody take me up like trying to pull me. . . . And when I looked up it was [Schoon] that held onto me. He started, "F--- the car, you little fruity-assed bitch," stuff like that, calling me all kind of names. And I don't know this dude from Adam, telling me this and that. He saw the knife on the dashboard and I grabbed it and put it in my side and I'm trying to back off from him. He held onto me and I'm trying to get his hand off me and the crowd was trying to pull him off. And he held onto my hand and pulled me out of the car. . . . This time the crowd was trying to get him back because he's trying to attack me. All I'm trying to do is leave and go home . . . He got out of the crowd and put on the brass knuckles and I'm backing up. . . . I'm backing out on the street and nobody was trying to help me no more . . . as soon as I got to the front of the car, [Gartley] picked up a big rock and came down with [Schoon]. And I'm so scared. I'm looking for somebody to help me. That's when [Gartley] throwed a rock. I ducked and I got up and got hit in the face. I bent over crying, "Dude, what you did that for?" And then [Aalborg] got in the middle saying, "Excuse me, sir. You just hit my boyfriend," and he hit her in the face, too. "You just hit a f---ing girl, man." He started coming to me again. At this point I had the knife out. So I'm backing up . . . After [Aalborg] got hit I thought she had left, so I guess I'm on my own. I guess the car had left. So I'm backing up and I had a knife. When I took the knife out . . . Schoon was like, "I ain't scared of your blade," and that's when he attacked me and that's when I stabbed him.

Defendant ran away from the scene of the stabbing.

At the conclusion of Defendant's case, Defendant renewed his motion to dismiss, which was denied. During the charge conference, the trial court directed the attorneys to North Carolina Pattern Jury Instruction 206.30. The court read part of the instruction aloud:

> [A] person is also justified in using defensive force when the force used by a person provoked is so serious the person using defensive force reasonably believes he was in imminent danger of death or serious bodily harm, the person using defense force had no reasonable means to retreat, and the force likely to cause death or injury was the only way to escape the damage. The defendant was not entitled to the benefit of self-defense if the aggressor had intent to kill or inflict serious or inflict serious bodily harm upon the deceased. Provocation should only be used if the defendant provoked the confrontation.

The State argued there was "ample evidence" the Defendant provoked the confrontation. Defendant objected as follows:

> I don't think we've heard any evidence that [Defendant] was the aggressor. Everyone testified that he never approached [Schoon]. [Schoon] came at him. Constantly. I don't believe there's any evidence that [Defendant] was the aggressor in this. I think there's plenty of evidence that [Schoon] was the aggressor in this. I say it's not appropriate.

The court decided to give the instruction because there was conflicting evidence on the issue of who was the aggressor which required jury resolution.

The trial court instructed the jurors on North Carolina Pattern Jury Instruction 206.30. The trial court gave instructions on four possible verdicts: not guilty, guilty of second-degree murder, guilty of voluntary manslaughter, or guilty of involuntary manslaughter. Defendant is not guilty "if the defendant acted in self-defense and if defendant was not the aggressor in provoking the fight and did not use excessive force under the circumstances." The trial court's instructions on second-degree murder and voluntary manslaughter included the following language:

> [I]n order for you to find the defendant guilty of murder in the second degree the State must prove beyond reasonable doubt, among other things, that the defendant did not act in self-defense, or failing in this, that the defendant was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased. If the State fails to prove either that the defendant did not act in self-defense or was the aggressor, with intent to kill or inflict serious bodily harm, you may not convict the defendant of second-degree murder, but you may convict the defendant of voluntary manslaughter if the State proves that the defendant was simply the aggressor without murderous intent in bringing on the fight in which the deceased was killed or that defendant used excessive force.
>
> Voluntary manslaughter is the unlawful killing of a human being without malice . . . Voluntary manslaughter is also committed if the defendant kills in self-defense but uses excessive force under the circumstances or was the aggressor without murderous intent in bring[ing] on the fight in which the killing took place. The burden is on the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. However, if the State proves beyond a reasonable doubt that the defendant, though otherwise acting in self-defense, used excessive force or was the aggressor, though the defendant had no

> murderous intent when the defendant entered the fight, the defendant would be guilty of voluntary manslaughter.

On 7 November 2014, the jury found Defendant guilty of voluntary manslaughter and assault with a deadly weapon inflicting serious injury. The trial court sentenced Defendant to consecutive sentences of 60 to 80 months imprisonment for voluntary manslaughter and 23 to 40 months for assault with a deadly weapon inflicting serious injury. Defendant gave notice of appeal in open court.

## II. Jurisdiction

Jurisdiction lies in this Court pursuant to N.C. Gen. Stat. § 7A-27(b) (2014), which provides for an appeal of right to the Court of Appeals from any final judgment of a superior court.

## III. Analysis

Defendant presents two issues on appeal. First, Defendant contends the trial court erred in denying his motion to dismiss the charge of second-degree murder. The Defendant also claims the trial court issued erroneous jury instructions not justified by the evidence. We disagree.

## A. Defendant's Motion to Dismiss

"This Court reviews the trial court's denial of a motion to dismiss *de novo*." *State v. Smith*, 186 N.C. App. 57, 62, 650 S.E.2d 29, 13 (2007). This Court must consider whether there is substantial evidence for each element of the *offense charged* and substantial evidence the defendant is the perpetrator of the offense. *State v.*

*Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (emphasis added) (quoting *State v. Barnes* 334 N.C. 67, 75, 430 S.E.2d914, 918 (1993)), *cert. denied*, 531 U.S. 890 (2000). Substantial evidence exists if a reasonable mind might accept the relevant evidence as adequate to support a conclusion. *State v. Smith*, 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980). On a motion to dismiss, the trial court must consider all evidence in the light most favorable to the State. *State v. Rose*, 339 N.C. 172, 192, 451 S.E.2d 211, 223 (1994), *cert. denied*, 515 U.S. 1135 (1995).

In this case, this Court must determine whether "substantial evidence" exists for each element of the offense charged, second-degree murder. Defendant is guilty of second-degree murder if he (1) killed (2) another living human being (3) with malice. *See* N.C. Gen. Stat. § 114-17 (2014). "When the killing with a deadly weapon is admitted or established, two presumptions arise: (1) that the killing was unlawful; (2) that it was done with malice; and an unlawful killing with malice is murder in the second degree." *State v. Fisher*, 318 N.C. 512, 525, 350 S.E.2d 334, 342 (1986) (quoting *State v. Gordon*, 241 N.C. 356, 358, 85 S.E.2d 322, 323 (1955)). If substantial evidence exists for each element of second-degree murder, then this Court should uphold the trial court's denial of Defendant's motion to dismiss.

When a defendant raises a self-defense claim, the "State need only prove beyond a reasonable doubt the non-existence of either of the first two elements [of

self-defense]." *State v. Kirby*, 206 N.C. App. 446, 453, 697 S.E.2d 496, 501 (2010). A

person acts in perfect self-defense when the following elements are met:

> (1) it appeared to defendant and he believed it to be
> necessary to kill the deceased in order to save himself from
> death or great bodily harm; and
> (2) defendant's belief was reasonable in that the
> circumstances as they appeared to him at the time were
> sufficient to create such a belief in the mind of a person of
> ordinary firmness; and
> (3) defendant was not the aggressor in bringing on the
> affray, i.e., he did not aggressively and willingly enter into
> the fight without legal excuse or provocation; and
> (4) defendant did  not use excessive force, *i.e.*, did not use
> more force than was necessary or reasonably appeared to
> him to be necessary under the circumstances to protect
> himself from death or great bodily harm.

*State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449–450 (2010) (quoting *State v.*

*Blue*, 356 N.C. 79, 88 n.1, 565 S.E.2d 133, 139 n.1 ((2002)).  On a motion to dismiss,

the State's burden is to "present sufficient substantial evidence which, when taken

in the light most favorable to the State, is sufficient to convince a rational trier of fact

that defendant did not act in self-defense." *Kirby*, 206 N.C. App. at 453, 697 S.E.2d

at 501(quoting *State v. Ammons*, 167 N.C. App. 721, 726, 606 S.E.2d 400, 404 (2005)).

Defendant contends that the trial court erred by denying his motion to dismiss

the charge of second-degree murder on the ground that he acted in self-defense.

Defendant does not dispute that he stabbed Schoon.  Defendant points to evidence

that Schoon started the fight by pulling him out of his car and then attacked him with

brass knuckles.  Defendant acted in response to Schoon's actions out of fear of being

harmed himself. Defendant also highlights his attempt to leave the parking lot before the argument became physical. We are not persuaded.

On appeal, this Court must affirm the trial court's denial of Defendant's motion to dismiss if the State presented "sufficient substantial evidence . . . to convince a rational trier of fact that defendant did not act in self-defense." *State v. Kirby*, 206 N.C. App. 446, 455, 697 S.E.2d 496, 501 (quoting *State v. Ammons*, 167 N.C. App. 721, 726, 606 S.E.2d 400, 404 (2005)). To do so, the State must present "sufficient substantial evidence" which, in the light most favorable to the State, is sufficient to convince a rational trier of fact that either of the first two elements of self-defense were not met. *Id.* at 453, 687 S.E.2d at 501.

Considering the State's evidence, it is reasonable that a juror could infer that Defendant did not act in self-defense. The State presented evidence that the Defendant threatened to run over a group of men, including Schoon, in the parking lot when they did not get out of his way. Evidence also supported the State's contention that Defendant escalated a fight from a verbal argument to a physical fight by pulling out a knife and stabbing Schoon.

In addition, the State presented evidence that Defendant fled the scene after both stabbings. A jury may infer self-defense was not used since Defendant fled the scene. *See Kirby*, 206 N.C. App. at 455–456, 697 S.E.2d at 503. The State presented testimony from Green and Dubon that Defendant's argument with Schoon began

after Defendant stabbed Dubon. According to the State's evidence, Defendant was fleeing the scene of the first stabbing when he nearly hit a group of people, leading to his argument with Schoon. It is undisputed that Defendant ran from the scene of the second stabbing. Defendant's flight after the second stabbing allows a juror to reasonably infer he had not killed in self-defense. As such, the trial court properly denied Defendant's motion to dismiss because there was sufficient evidence presented to establish Defendant was not acting in self-defense.

## B. Jury Instructions

On appeal, "[a] party may not make any portion of the jury charge or omission therefrom the basis of an issue presented on appeal unless the party objects thereto before the jury retires . . . ." *State v. McNeil*, 350 N.C. 657, 691, 518 S.E.2d 486, 507 (1999). If an objection was raised at trial, this Court may review the challenged instruction *de novo*. *State v. Osorio*, 196 N.C. App. 458, 466, 675 S.E.2d 546, 549 (2009). "Where there is evidence that defendant acted in self-defense, the court must charge on this aspect even though there is contradictory evidence by the State or discrepancies in defendant's evidence." *State v. Dooley*, 285 N.C. 158, 163, 203 S.E.2d 815, 818 (1974).

The Supreme Court of North Carolina explained there are two types of self-defense: perfect and imperfect.

> Perfect self-defense excuses a killing altogether, while imperfect self-defense may reduce a charge of murder to

> voluntary manslaughter. For defendant to be entitled to an instruction on either perfect or imperfect self-defense, the evidence must show that defendant believed it to be necessary to kill his adversary in order to save himself from death or great bodily harm. In addition, defendant's belief must be "reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness."

*State v. Locklear*, 349 N.C. 118, 154, 505 S.E.2d 277, 298 (quoting *State v. Ross*, 338 N.C. 280, 449 S.E.2d 556) (1998). Perfect self-defense excuses a killing when four elements existed at the time of the killing:

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
> (3*) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation*; and
> (4) defendant did not use excessive force, *i.e.*, did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449–450 (2010) (emphasis added) (quoting *State v. Blue*, 356 N.C. 79, 88 n.1, 565 S.E.2d 133, 139 n.1 ((2002)). The State must prove beyond a reasonable doubt that defendant did not act in self-defense for the jury to return a guilty verdict. *Id.*, 688 S.E.2d at 450.

Imperfect self-defense exists when a defendant reasonably believed it necessary to kill another to save himself from death or great bodily harm even if defendant was the aggressor or used excessive force. *State v. Blue*, 356 N.C. 79, 89, 565 S.E.2d 133, 139 (2002). An aggressor "aggressively and willingly enters into a fight without legal excuse or provocation." *State v. Vaughn*, __ N.C. App. __, __, 742 S.E.2d 276, 279 (2013). If defendant used imperfect self-defense, defendant would be guilty of at least voluntary manslaughter. *Id.*, 565 S.E. 2d at 139.

Defendant argues the jury instructions were erroneous because the trial court included the "aggressor" language in the instructions. As Defendant objected in the charge conference, there was no evidence presented that Defendant was the aggressor. Defendant cites *State v. Vaughn*, a case where "the trial court committed plain error by instructing the jury that [defendant] was not entitled to the benefit of self-defense if she were the aggressor in [defendant's] altercation . . . because 'no evidence suggested that [defendant] was the aggressor.'" *State v. Vaughn*, __ N.C. App. __, __, 742 S.E.2d 276, 278 (2013).

We are not persuaded that *Vaughn* applies here. In *Vaughn*, defendant and two men got into a verbal argument in Defendant's car. *Id.*, 742 S.E.2d at 276–277. Defendant got out of the car, trying to "diffuse the situation." *Id.*, 742 S.E.2d at 277. At that point, one man also left the car and beat her. *Id.*, 742 S.E.2d at 277. Injured, defendant grabbed a knife out of the car and tried to make sure her friend, the other

man, was unhurt. *Id.*, 742 S.E.2d at 277. While defendant was looking for him, the man attacked her again, and she stabbed him with the knife. *Id.*, 742 S.E.2d at 277.

The facts in this case are not analogous to *Vaughn*. This case contains evidence that Defendant was the aggressor and evidence Defendant was not the aggressor whereas in *Vaughn*, it was undisputed that defendant was not the aggressor. Here, the State presented evidence that Defendant either initiated or escalated the fight. For example, Walker and Gartley testified that their argument with Defendant began when he almost hit them with his car. Gartley's testimony also provided evidence that Defendant drove next to the second group of men, yelling at them, instead of driving away after nearly hitting them. The State provided evidence Defendant pulled out a knife, escalating the fight from what was previously a verbal argument.

Defendant also objected to the use of the term "aggressor" in the jury charge. The elements of self-defense, both perfect and imperfect, as they are written in the General Statutes, include the term "aggressor." If there is some evidence Defendant was the aggressor, it is proper to instruct the jury using that term and allow the jury, as the trier of fact, to determine whether Defendant was or was not the aggressor and whether Defendant acted in self-defense. We find no error in the jury instructions.

## IV. Conclusion

For the foregoing reasons, we find no error and the final judgment of the trial court is affirmed.

NO ERROR.

Judges Dillon and Dietz concur.

Report per Rule 30(e).