STATE OF NORTH CAROLINA v. JACKIE CRADDOCK SMITH, Defendant-Appellant

No. COA95-178

(Filed 5 December 1995)

**1. Burglary and Unlawful Breakings § 8 (NCI4th)— unoccupied dwellings—elderly residents absent due to ill health—sufficiency of evidence**

Homes owned by the elderly victims were "dwelling houses of another" within the meaning of the burglary statute, even though the victims were living elsewhere due to health problems when the burglaries occurred, since a dwelling house does not lose its character merely because its elderly owner/occupant is residing elsewhere due to ill health; in this case the owners expressed an intent to return to their homes when they were able; and all of the homes contained appliances, furniture, and various personal effects belonging to the owners.

**Am Jur 2d, Burglary §§ 3, 4.**

**Occupant's absence from residential structure as affecting nature of offense as burglary or breaking and entering. 20 ALR4th 349.**

**2. Criminal Law § 382 (NCI4th)— trial court questioning witness—no error**

The trial court did not err in questioning a prosecution witness where the judge acted merely to clarify the witness's testimony on a particular point.

**Am Jur 2d, Judges § 171; Trial §§ 274, 275, 304.**

Appeal by defendant from judgment entered 28 September 1994 by Judge Jerry R. Tillet in Beaufort County Superior Court. Heard in the Court of Appeals 24 October 1995.

*Attorney General Michael F. Easley, by Assistant Attorney General David G. Heeter, for the State.*

*Seth H. Edwards for defendant-appellant.*

JOHNSON, Judge.

The evidence presented at trial tended to show that on 21 November 1993, defendant Jackie Craddock Smith did break and enter, during the nighttime, several residences and one storage building located in Pinetown, North Carolina. The residences were owned by Myrtle Peele, Edith Jackson, and Noah Leggett. Mr. Leggett also owned the storage building, located near his residence, that was broken into. Additionally, the evidence showed that defendant did break and enter, during the nighttime, Starley Bell's residence in Bath, North Carolina. On each occasion, defendant was accompanied by one or more co-defendants and various items of personal property were stolen.

Co-defendants Michael Keech, Rodney Jackson, and Michael Lewis testified in regards to defendant's involvement in the events of 21 November 1993 and 4 January 1994. Defendant's daughter, Chastity Jefferson, who was also present on the above-mentioned occasions, testified as to her mother's involvement in the crimes. Ms. Jefferson was not, however, charged with any crimes.

On 21 November 1993, Edith Jackson's residence, jointly owned by son, Dallas Jackson, was unoccupied. Due to health problems, Ms. Jackson had been living in Virginia with her daughter at that time. There were, however, appliances, furniture and various other personal effects belonging to Ms. Jackson, in the residence at the time of the break-in. In her absence, Ms. Jackson's son mowed the yard and maintained the residence. A week prior to the break-in, Dallas Jackson had shown the property to some people who were interested in buying it. There was no evidence presented at trial as to how long Ms. Jackson had resided with her daughter in Virginia. Ms. Jackson died on 22 November 1993, the day after defendant broke into her home.

Noah Leggett's home was also unoccupied on 21 November 1993. Mr. Leggett, who had congestive heart problems, was, at that time, living at the Autumn Field Rest Home in Belhaven, North Carolina. Prior to moving to the rest home, however, Mr. Leggett had lived in his home in Pinetown. Mr. Leggett had resided at the rest home between

STATE v. SMITH

[121 N.C. App. 41 (1995)]

one and six months prior to the break-in. At the time of the break-in, there were various personal items belonging to Mr. Leggett in the residence. In addition, a variety of tools were stored in the shed adjacent to the residence. Mr. Leggett testified at trial that he intended to return to his home "[a]s soon as [he] was able." Mr. Leggett had, in fact, returned to his Pinetown residence for a time after leaving the rest home, before having a heart attack. Thereafter, he was hospitalized in Washington, North Carolina before moving into his daughter's home in Durham, North Carolina—where he resided at the time of trial. Mr. Leggett testified that he had spent "a lot of time away from home due to illness."

Similarly, Myrtle Peele's home was unoccupied when defendant broke into her residence on 21 November 1993, because she was living in a nursing home at that time. When questioned on voir dire to determine her competency to testify, Ms. Peele testified that, on 21 November 1993, she resided at the Beaufort County Nursing Home, and had so resided since 18 June 1993. Prior to 18 June, however, Ms. Peele had resided in her home. Further, she testified that she would return to her home "if [she] was able." When the break-in occurred, Ms. Peele's house still contained various personal items belonging to her. Her brother, who lived approximately a mile and a half away, acting on her behalf, had checked her house about two weeks prior to the evening of 21 November.

At the conclusion of the State's evidence, defendant made a Motion to Dismiss the charges against her. Specifically, defendant argued that as the homes owned by Edith Jackson, Noah Leggett, and Myrtle Peele, had been unoccupied for an extended period of time, they were not "dwelling houses" and, therefore, could not support a conviction for three of the four counts of Second Degree Burglary. Defendant's motion was subsequently denied and the trial continued to a jury verdict, which found defendant guilty of four counts of Second Degree Burglary, five counts of Felonious Larceny, and one count of Felonious Breaking and/or Entering. Consequently, defendant was sentenced by Judge Jerry R. Tillet to four consecutive twenty-year sentences in the North Carolina Department of Corrections. Defendant gave written Notice of Appeal to this Court, and thereafter, timely perfected said appeal.

[1] Defendant's first argument on appeal is that the trial court erred in denying his Motion to Dismiss three of the four counts of Second Degree Burglary because there was insufficient evidence that the

properties of Ms. Jackson, Mr. Leggett, and Ms. Peele were "dwelling houses of another." We cannot agree.

In considering a motion to dismiss, the trial court must consider the evidence in the light most favorable to the State. *State v. Mlo*, 335 N.C. 353, 440 S.E.2d 98, *cert. denied, Mlo v. North Carolina,* —— U.S. ——, 129 L. Ed. 2d 841 (1994). The court must determine if the evidence, in the light most favorable to the State, shows substantial evidence of each offense charged and, further, shows that defendant committed the offense. *Id.* Substantial evidence is that amount of relevant evidence which a reasonable mind would find sufficient to support a conclusion. *State v. Patterson*, 335 N.C. 437, 439 S.E.2d 578 (1994). If there is any evidence presented at trial which tends to show that the defendant committed the offense at issue, the motion is properly denied and instead, the defendant's guilt or innocence must be left to the jury. *State v. Vinson*, 63 N.C. 335 (1869).

North Carolina General Statutes section 14-51 provides that the constituent elements of burglary are: (1) the breaking (2) and entering (3) in the nighttime (4) into the dwelling house or sleeping apartment (5) of another (6) with the intent to commit a felony therein, North Carolina General Statutes § 14-51 (1993); *State v. Hobgood*, 112 N.C. App. 262, 264, 434 S.E.2d 881, 882 (1993), *disc. review denied*, 335 N.C. 772, 442 S.E.2d 523 (1994) (*citing State v. Beaver*, 291 N.C. 137, 141, 229 S.E.2d 179, 181 (1976)). If the dwelling house is not actually occupied at the time of the crime, the burglary is in the second degree. *Id.* In order to obtain a conviction for burglary, it is paramount that the State produce substantial evidence that tends to show that the premises broken into was the dwelling house of another. *State v. Harold*, 312 N.C. 787, 325 S.E.2d 219 (1985).

Although the issue in the instant case as to whether a dwelling house loses its character merely because its elderly owner/occupant is residing elsewhere, due to ill health, is one of first impression, it is not a difficult one, requiring little more than a common-sensical analysis. The State references two cases in which North Carolina courts have addressed shorter periods of the vacancy of a dwelling which had been the subject of burglary. *See State v. Jolly*, 297 N.C. 121, 254 S.E.2d 1 (1979); *State v. Simons*, 65 N.C. App. 164, 308 S.E.2d 502 (1983). Our Courts have also addressed the burglary of dwelling houses which were unoccupied for longer periods of time in *State v. Helton*, 79 N.C. App. 566, 339 S.E.2d 814 (1986) and *State v.*

*Alexander,* 18 N.C. App. 460, 197 S.E.2d 272, *cert. denied,* 283 N.C. 666, 198 S.E.2d 721 and 284 N.C. 255, 200 S.E.2d 655 (1973), but these cases were decided on other grounds. In *Helton,* the house which was the subject of the burglary, had been unoccupied for an extended period during November and early December, while in *Alexander,* the burglarized, unoccupied house had a "For Sale" sign in the front yard, but still had household goods inside.

It must also be noted that both Mississippi and California courts have decided cases which are reminiscent of the facts in the instant case. In *Course v. State,* 469 So.2d 80 (Miss. 1985), it was held that the house which had been broken into, was a dwelling house, in spite of the fact that the owner had been living in a nursing home for two months prior to the time of the burglary. In *Course,* as in the instant case, the owner had left her personal possessions in her house and intended to return to her home, when her health permitted. In *People v. Marquez,* 192 Cal.Rptr. 193 (Ct. App. 1983), the court found that the defendant had burglarized an inhabited dwelling house, although a conservator had been appointed to handle the affairs of the owner. The owner had moved into a boarding house, where she had lived for more than a year before the burglary, and it was doubtful if she would return to her home. The residence was, however, being maintained by the conservator. In both of these cases, the respective courts looked at the intent of the owner/occupier or the person entitled to occupy the dwelling to see if there was evidence that the owner had ever abandoned the residence.

We also find several treatises instructive on this issue. In LaFave & Scott's treatise on Criminal Law, it is stated, "[i]f the residents are away, be it for a short time or for extended portions of the year, it will still suffice as a dwelling house." LaFave & Scott, Criminal Law § 8.13, at 796 (2d ed. 1986). Wharton's treatise on Criminal Law likewise notes, "[i]f a person leaves his dwelling house for a particular or indefinite period of time intending thereafter to return— . . . his dwelling house remains a dwelling house even during his absence." Wharton's Criminal Law, Burglary § 335, at 206-07 (14th ed. 1980).

Often, where there is no direct evidence in regards to a person's intent, we must look to surrounding circumstances to find it. In fact, Perkins and Boyce's treatise on Criminal Law explains, "no lapse of time, however great, will be sufficient where there is throughout a fixed intention of returning [to one's dwelling]." Perkins and Boyce, Criminal Law at 258-59 (3d ed. 1982). A person's intention to return to

his home is determined mainly from the condition in which the house was left, from the fact that the household effects were or were not taken away, and from the fact that the occupants had or had not established domicile elsewhere. 13 Am.Jur.2d *Burglary* § 4.

The facts in the case *sub judice*, taken in the light most favorable to the State, show that the homes of Ms. Jackson, Mr. Leggett, and Ms. Peele were all unoccupied at the time that they were burglarized. At trial, both Mr. Leggett and Ms. Peele expressed an intent to return to their respective homes as soon as their health permitted. Ms. Jackson, however, had died the day after her home was broken into, and there was no direct evidence presented at trial, in regards to her intent to return to her home. Further, though the evidence tended to show that Ms. Jackson's son had shown the house to a potential buyer during the week prior to the break-in, no sale had been consummated at the time of the break-in. On 21 November 1993, neither Ms. Jackson nor her son demonstrated any intent to abandon the house as a residence. In fact, there was testimony to the effect that *all* of the residences contained various items of personal property belonging to their owners. Moreover, in Ms. Jackson and Ms. Peele's case, the residences were being maintained by relatives until their owners could return home.

We do not think, as defendant contends, that the character of a dwelling place changes simply because its owners are absent for a time, especially where there are objects of value left in the homes and there are persons who maintain the homes in the owners' absence. Each residence contained appliances, furniture, and various personal effects belonging to their respective owners. In the ordinary course of events, one does not usually leave items of value in a property that they have abandoned or intend to abandon. The facts and attendant circumstances indicate that all of the owners had the requisite intent to return to their homes, if at all possible.

Defendant would have us believe that when elderly citizens leave their homes and, due to health problems, move to another residence until they are able to care for themselves, they have abandoned their homes or established domicile elsewhere. We find this position to be unpersuasive. As the figures of life-expectancy increase, our nation's elderly will increasingly face the need to move into residential care or nursing facilities for various periods of time. But this is not to say that their homes will lose their characteristics of being "dwelling places." It would take more than mere absence to negate the nature of the

home as being a "dwelling place." Defendant's argument to the contrary, therefore, must fail.

**[2]** Plaintiff also argues that the trial court erred in questioning Mr. Leggett, a State witness, about his intent to return to his house. Again, we do not agree.

Our Courts have repeatedly recognized the authority that a trial judge has in determining the manner in which a trial is conducted. His decision is to be disturbed on appeal, only in the event that there was some abuse of discretion. *State v. McCray*, 312 N.C. 519, 324 S.E.2d 606 (1985). In fact, our Supreme Court has specifically held that a judge may question a witness for the purpose of clarifying his testimony, without expressing an opinion on the evidence or witnesses. *State v. Rinck*, 303 N.C. 551, 280 S.E.2d 912 (1981). " 'It is entirely proper, and sometime necessary, that [a judge] ask questions of a witness so that the "truth, the whole truth, and nothing but the truth" be laid before the jury.' " *State v. Freeman*, 280 N.C. 622, 627, 187 S.E.2d 59, 63 (1972) (*quoting Eekhout v. Cole*, 135 N.C. 583, 589, 47 S.E. 655, 657 (1904)).

In the instant case, the trial judge, at the close of redirect examination of Noah Leggett, asked Mr. Leggett, "[w]hen you left to go to the rest home did you intend on coming back to your place in Pinetown to sleep there regularly?" Mr. Leggett replied, "[a]s soon as I was able." The judge, it seems, acted merely to clarify Mr. Leggett's testimony as to his intent to return to his Pinetown home. Such action was within the trial court's discretion, and we therefore, find no error.

In light of the foregoing, we find no error in the instant case.

No error.

Judges WALKER and SMITH concur.