STATE OF NORTH CAROLINA v. ANTHONY REVELS

No. COA01-1233

(Filed 17 September 2002)

**1. Homicide— first-degree murder—motion to dismiss—sufficiency of evidence**

The trial court did not err denying defendant's motion to dismiss the two charges of first-degree murder even though defendant alleged self-defense, because: (1) there was substantial evi-

dence supporting the necessary elements of first-degree murder; and (2) although the evidence offered by defendant provided a conflicting account of what occurred and indicated that defendant acted in self-defense, contradictions in the evidence remain for the jurors to resolve.

**2. Homicide— first-degree murder—motion for mistrial— emotional outbursts by victim's family**

The trial court did not abuse its discretion in a double first-degree murder case by denying defendant's motion for a mistrial even though there were several incidents of emotional outbursts by members of one of the victim's families, because: (1) the trial court excused the jurors when the emotional outburst occurred, cautioned the audience, and provided a curative instruction to the jury; and (2) defendant has failed to establish that the emotional outbursts resulted in irreparable prejudice to defendant.

Appeal by defendant from judgments entered 15 March 2000 by Judge Gregory A. Weeks in Robeson County Superior Court. Heard in the Court of Appeals 13 August 2002.

*Attorney General Roy A. Cooper, III, by Special Deputy Attorney General David Roy Blackwell, for the State.*

*Carlton M. Mansfield for defendant-appellant.*

HUNTER, Judge.

Anthony Revels ("defendant") appeals from judgments sentencing him to life imprisonment without parole for his conviction of two counts of first degree murder. Defendant assigns error to the trial court's denial of his motion to dismiss the charges of first degree murder and his motion for mistrial. For reasons stated herein, we find no error.

The State's evidence at trial tended to show that on the morning of 17 August 1998, law enforcement officers found a red Dodge Avenger with two dead individuals, identified as Patrick Sam Locklear ("Locklear") and Billy Dean Wearnes ("Wearnes"), seated inside the vehicle at the intersection of John French Road and Melinda Road in Robeson County. Officers found a nine millimeter handgun with its safety off and a bullet in its chamber, laying on the front passenger's side floorboard.

A forensic pathologist, Dr. Robert L. Thompson ("Dr. Thompson"), testified that Locklear's autopsy revealed five gunshot wounds and opined that Locklear's death was caused by gunshot wounds to the head and chest. Dr. Thompson further testified that Wearnes' autopsy revealed three gunshot wounds. According to Dr. Thompson, the cause of Wearnes' death was a bullet which entered his mouth and injured his right carotid artery.

The State's evidence also tended to show that defendant, Brian Chavis ("Chavis"), and several others cruised Pembroke, North Carolina on the night of 16 August 1998. Later that evening, defendant's group as well as Locklear and Wearnes, who were driving a red Dodge Avenger, convened at Curley Jacobs' ("Jacobs") trailer to talk and drink beer. At one point while at Jacobs' home, Wearnes began showing off a small black nine millimeter gun. Defendant then removed a gun from Jacobs' waistband and told Wearnes that the gun was a real nine millimeter. Chavis never saw defendant return the gun to Jacobs.

Chavis testified that around 3:00 a.m. on 17 August 1998, defendant stated "he was thinking about robbing [Locklear and Wearnes], they wasn't nothing but a bunch of punks, and it wouldn't take nothing but two knocks on the side of the head." Jacobs testified that he lent his nine millimeter to defendant prior to defendant's statements about robbing Locklear and Wearnes.

At approximately 3:15 a.m., defendant, Chavis, Locklear, and Wearnes left Jacobs' trailer and drove to Bennie Locklear's ("Bennie") residence. Bennie was Wearnes' employer, who according to Wearnes, owed him money. Defendant and Chavis rode in defendant's truck while Locklear and Wearnes rode in Locklear's Avenger; defendant and Locklear were the drivers. In transit, when defendant made a sharp left turn, Chavis saw Jacobs' nine millimeter gun slide across the seat of the truck. When he realized that Chavis saw the gun, defendant told Chavis that he was going to get Locklear and Wearnes.

Defendant, Chavis, Locklear, and Wearnes arrived at Bennie's trailer between 3:30 and 4:00 a.m. on 17 August 1998. Defendant got out of his truck and walked to Locklear's car and started talking to Locklear while Wearnes walked up to the trailer. When Bennie asked Wearnes who was with him, Wearnes responded that defendant and the crowd were with him. Bennie then told Wearnes to stay right there and shut the door of the trailer. Wearnes quickly walked back to

Locklear's car and said, " '[l]et's go.' " As they were leaving, Chavis heard about seven gunshots. Defendant and Chavis followed Locklear and Wearnes to an open area next to a tobacco field. The two vehicles were parked with the driver's side of defendant's truck beside the driver's side of Locklear's car.

Defendant asked Wearnes why he had mentioned his name to Bennie. Wearnes replied that Bennie asked him who was with him so he told him. Locklear stated, " '[w]ell, where do we go from here?' " and defendant responded, " '[y]ou don't go nowhere[.]' " Defendant then began shooting toward Locklear and Wearnes. According to Chavis, defendant shot twelve or thirteen times. Defendant exited his truck, walked over to Locklear's car and reached into the car through the driver's side window. When defendant returned to his truck, he had a ring and a wallet that he did not have before the shooting.

Defendant and Chavis then left the scene and traveled to Jacobs' trailer just before daylight. Defendant told Jacobs that he had to kill Locklear and Wearnes. Jacobs was in disbelief so defendant showed him the ring and wallet. Defendant, Chavis, and Jacobs then got into defendant's truck; defendant drove until reaching a dirt road where defendant stopped the truck. Defendant pulled out Locklear's food card and Blue Cross/Blue Shield card from the wallet which he showed Jacobs and Chavis. Defendant then stuck the cards back in the wallet and threw the wallet on the ditch bank. Defendant, Jacobs, and Chavis returned to Jacobs' trailer.

On 21 August 1998, Jacobs turned his handgun over to the sheriff's department. Eugene E. Bishop, a special agent with the North Carolina State Bureau of Investigation, testified that Jacobs' gun was compared with the bullet fragments recovered from the two victims' bodies and this comparison showed that Jacobs' gun had fired the bullets.

Defendant testified at trial in his own defense and provided a different account indicating that he had acted in self-defense. Defendant testified that after parking by the tobacco barn on the morning of 17 August 1998, Wearnes told him that he wanted defendant to drive his truck by Bennie's trailer so that he and Locklear could do a drive-by shooting. According to defendant, after he refused, Wearnes began firing shots at him. Defendant then returned fire using Jacobs' nine millimeter pistol. After the shooting ceased, defendant drove back to Jacobs' residence where he picked up his girlfriend and went home.

Defendant was charged with two counts of first degree murder, one count of conspiracy to commit armed robbery, and two counts of robbery with a dangerous weapon. At the close of the State's evidence, the trial court granted defendant's motions to dismiss the charge of conspiracy to commit armed robbery and one count of robbery with a dangerous weapon. A jury found defendant guilty of two counts of first degree murder and not guilty of robbery with a dangerous weapon. Defendant appeals.

I.

[1] Defendant initially contends the trial court erred in denying his motion to dismiss the charges of first degree murder at the close of all the evidence based on the insufficiency of the evidence. Defendant asserts that his motion to dismiss should have been granted because of the evidence he presented showing that he acted in self-defense. We disagree.

At the outset, when reviewing a motion to dismiss, the trial court must determine "whether there is substantial evidence (1) of each essential element of the offense charged and (2) that defendant is the perpetrator of the offense." *State v. Lynch*, 327 N.C. 210, 215, 393 S.E.2d 811, 814 (1990). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). When considering a motion to dismiss, the trial court must view the evidence in the light most favorable to the State. *State v. Smith*, 121 N.C. App. 41, 44, 464 S.E.2d 471, 473 (1995). "[I]f the evidence is sufficient only to raise a suspicion or conjecture as to either the commission of the offense or the identity of the defendant as the perpetrator, the motion to dismiss should be allowed." *State v. Bates*, 309 N.C. 528, 533, 308 S.E.2d 258, 262 (1983).

First degree murder is defined as "the intentional and unlawful killing of a human being with malice and with premeditation and deliberation." *State v. Flowers*, 347 N.C. 1, 29, 489 S.E.2d 391, 407 (1997). "A killing is 'premeditated' if the defendant contemplated killing for some period of time, however short, before he acted." *State v. Williams*, 334 N.C. 440, 447, 434 S.E.2d 588, 592 (1993), *judgment vacated on other grounds*, 511 U.S. 1001, 128 L. Ed. 2d 42 (1994). Deliberation means an intent to kill, carried out in a cool state of blood, in furtherance of a fixed design for revenge or to accomplish an unlawful purpose and not under the influence of a violent passion,

suddenly aroused by lawful or just cause or legal provocation. *State v. Lowery*, 309 N.C. 763, 768, 309 S.E.2d 232, 237 (1983).

In the case *sub judice*, the State's evidence tended to show that while at Jacobs' home on the night of 16 August 1998, defendant brandished to the crowd Jacobs' nine millimeter pistol. Additionally, Chavis testified that defendant stated that he was thinking of robbing the victims, Locklear and Wearnes. Defendant described the victims as "nothing but a bunch of punks," and pointed out that "it wouldn't take nothing but two knocks on the side of the head" to rob them. While following Locklear and Wearnes to Bennie's residence, Chavis saw Jacobs' nine millimeter pistol slide across the seat at which point defendant informed Chavis that he was going to get Locklear and Wearnes. While parked beside a tobacco barn on the morning of 17 August 1998, when Locklear asked " '[w]ell, where do we go from here?' " defendant responded " '[y]ou don't go nowhere,' " and defendant began shooting toward Locklear and Wearnes in the car. Chavis recalled defendant shooting twelve or thirteen times. The State's evidence tended to show that defendant exited the truck and reached into the victims' car. Defendant returned to the truck with a ring and a wallet, containing cards with Locklear's name on them, that he did not have before the shooting. Further, the State offered evidence showing that the bullets recovered from the victims' bodies had been fired by Jacobs' gun.

When the evidence is viewed in the light most favorable to the State, there is substantial evidence supporting the necessary elements of first degree murder. Therefore, the trial court was proper in denying defendant's motion to dismiss the first degree murder charges. The evidence offered by defendant provided a conflicting account of what occurred and indicated that defendant acted in self-defense. However, contradictions in the evidence remain for the jurors to resolve. *State v. Brown*, 310 N.C. 563, 313 S.E.2d 585 (1984). This assignment of error is overruled.

II.

[2] Defendant next argues the trial court erred in denying his motion for mistrial following several incidents of emotional outbursts by members of Locklear's family. N.C. Gen. Stat. § 15A-1061 provides in pertinent part: "The judge must declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case."

N.C. Gen. Stat. § 15A-1061 (2001). The decision to grant or deny a defendant's motion for mistrial rests within the sound discretion of the trial court. *State v. Blackstock*, 314 N.C. 232, 243, 333 S.E.2d 245, 252 (1985). Therefore, a trial court will not be reversed unless its "ruling is clearly erroneous so as to amount to a manifest abuse of discretion . . . ." *State v. Sorrells*, 33 N.C. App. 374, 377, 235 S.E.2d 70, 72 (1977).

The record reveals that during trial, the trial judge had to caution the audience several times regarding audible emotions. At one point, a member of Locklear's family began sobbing and immediately rose and attempted to leave the courtroom. The court then sent the jury out of the courtroom. Defendant moved for a mistrial and a hearing was conducted. After denying defendant's motion, the trial judge called the jury back in and instructed the jurors that they were not to consider the emotional outburst in reaching a verdict. We conclude the trial court did not abuse its discretion in denying defendant's motion for mistrial. The trial court excused the jurors when the emotional outburst occurred, cautioned the audience, and provided a curative instruction to the jury. Defendant has failed to establish that it was clearly erroneous for the trial court to find that the emotional outburst did not result in irreparable prejudice to defendant. Accordingly, this assignment of error has no merit.

No error.

Judges GREENE and TIMMONS-GOODSON concur.