An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA23-811

Filed 4 June 2025

Cabarrus County, No. 19 CRS 53376

STATE OF NORTH CAROLINA

v.

JASON HARKEY, Defendant.

Appeal by Defendant from judgment entered 10 October 2022 by Judge Athena Fox Brooks in Cabarrus County Superior Court. Heard in the Court of Appeals 24 January 2024.

> *Attorney General Jeff Jackson, by Assistant Attorney General Thomas H. Moore, for the State.*

> *Attorney William D. Spence, for defendant-appellant.*

PER CURIAM.

This case involves the shooting of an armed individual during an intrafamily dispute. Jason Harkey ("Defendant") appeals from final judgment, claiming the trial court committed prejudicial and reversible error by denying his motion to dismiss the charge of second-degree murder and by instructing the jury on the aggressor doctrine. Federal and North Carolina jurisprudence confirms the natural right of self-defense

is available unless one acts in a manner that merits forfeiture. *See District of Columbia v. Heller*, 554 U.S. 570, 592, 128 S. Ct. 2783, 2797 (2008) ("[I]t has always been widely understood that the Second Amendment, like the First and Fourth Amendments, codified a *pre-existing* right."). *See also State v. Huntly*, 25 N.C. 418, 422 (1843) ("While [the bill of rights in this State] secures to [every man] a *right* of which he cannot be deprived, it holds forth the *duty* in execution of which that right is to be exercised."). The General Assembly codified and supplanted the common law right to perfect self-defense in enacting N.C. Gen. Stat. §§ 14-51.2–.4 (2023). *See State v. McLymore*, 380 N.C. 185, 190, 868 S.E.2d 67, 72 (2022) ("Although not expressly stated, the General Assembly's intention to abolish the common law right to perfect self-defense is unmistakable."). North Carolina law establishes that one acting as the initial provocateur of the use of force against oneself—the aggressor—in a confrontation, stands to lose their claim of self-defense. *See* N.C. Gen. Stat. § 14-51.4; *see also State v. Hicks*, 385 N.C. 52, 60, 891 S.E.2d 235, 241 (2023). The result of this case thus hinges on the actions of Defendant and whether there is threshold evidence that he acted as the aggressor. *See State v. Mumma*, 372 N.C. 226, 239 n.2, 827 S.E.2d 288, 297 (2019). A meticulous examination of the record leads us to conclude the trial court did not commit error by denying Defendant's motion to dismiss, but did commit error by instructing the jury on the aggressor doctrine. Since the record does not contain the jury's rationale underlying its verdict—showing

whether it employed the erroneous instruction to reach its decision—we vacate the judgment and remand for a new trial.

## I.      Background

On the evening of 19 August 2019, law enforcement officers and other emergency responders were dispatched to a residence in Cabarrus County in reference to a shooting.  Upon arrival, Cabarrus County Sheriff's Deputy Jacob Hickman observed Defendant "with his hands up in the yard . . . walking in [his] direction."  Deputy Hickman detained Defendant.  Inside the house where the shooting took place ("Thompson residence"), a paramedic with Cabarrus County Emergency Medical Services ("EMS") found Mr. Arthur Lynn Thompson ("Mr. Thompson") lying on the kitchen floor.  Mr. Thompson had no pulse and was not breathing.  In response, EMS attempted to perform cardiopulmonary resuscitation ("CPR").  A cardiac monitor reading, which measures the electrical activity of the heart, determined Mr. Thompson had "flat line[d]."  The State's expert witness, a medical examiner and forensic pathologist, later determined Mr. Thompson's cause of death resulted from a single .25 caliber gunshot wound to his chest.

Two .380 caliber handguns and one .44 caliber revolver were found in the kitchen with Mr. Thompson.  Both .380 caliber handguns were holstered on Mr. Thompson's person.  The .44 caliber revolver was in Mr. Thompson's right hand—with his finger inside of the trigger guard—until Mrs. Judy Thompson ("Mrs. Thompson") removed it to give him CPR.  Law enforcement located a .25 caliber

derringer pistol in the bed of a truck. The truck was parked in a shared driveway located between the Thompson residence and Defendant's residence. The .25 caliber, single action, "two-shot pistol" belonged to Defendant, who is Mr. Thompson's stepson and Mrs. Thompson's son. On 9 September 2019, a grand jury returned a true bill of indictment charging Defendant with second-degree murder. On 3 October 2022, Defendant's jury trial commenced.

The only witness to the shooting was Mrs. Thompson—Defendant's mother and Mr. Thompson's wife of seven years. Mrs. Thompson's testimony tended to show the following: Around 8:30 p.m. on 19 August 2019, Mr. and Mrs. Thompson were watching television in their living room when the doorbell rang. Although Mrs. Thompson "normally [ ] answered the door," Mr. Thompson responded on this occasion. She "did not hear any arguing at all," but became concerned because "it seemed like it was taking just a little bit longer," and thought "well, who is it[?]" Mrs. Thompson "started to the door" and passed Mr. Thompson in the kitchen as he said, "It's [Defendant] . . . You need to take care of this or I'll take care of him." Mr. Thompson relayed that Defendant had said, "This light . . . . It's so bright. It's all over my house." Mrs. Thompson told Mr. Thompson to "just go on," and she would "take care of it." Mrs. Thompson went to the door to tell Defendant, "Just go on home" because she would "handle it."

When answering the door, Mrs. Thompson did not see a gun in Defendant's hand. Next, she heard Defendant exclaim, "Mom, he's got a gun." She also saw a gun

in Mr. Thompson's hand and heard him say, "something about shooting." Defendant "moved [Mrs. Thompson] out of the way because he said [Mr. Thompson's] arm was going up with a gun in it." At that point, Defendant fired a single round from the .25 caliber handgun at Mr. Thompson. Mrs. Thompson turned around to see Mr. Thompson's right hand raised, holding a gun, while his left hand grabbed his shirt. She noted, Mr. Thompson's gun was "up," and no longer "down by his side." Mrs. Thompson added she did not hear Defendant threaten Mr. Thompson, nor did he appear aggressive, "just upset." She stated Defendant "was wanting to know . . . what he had done to bring [Mr. Thompson] back to putting the light back up . . . to start this all over again . . . ." Mrs. Thompson called 911 and attempted to perform CPR on Mr. Thompson. Before attempting CPR, Mrs. Thompson removed the .44 caliber revolver from Mr. Thompson's hand. When doing so, she observed that Mr. Thompson's finger was "inside the trigger well," and he "was holding [the firearm] as tight as he could . . . ."

Mrs. Thompson also gave a statement to law enforcement just after the events on 19 August 2019, which was received into evidence by the trial court during her direct examination. Mrs. Thompson noted the statement was mostly correct, "[e]xcept with a few flaws in it." One flaw she cited in the statement was that she "began to push [Defendant] back." At trial, Mrs. Thompson said, "I never did push [Defendant] . . . I put my hands up. I never did push him." She clarified, "[w]hen [Mr. Thompson] came around and I heard him say something about shoot, and I said,

- 5 -

[n]o. And that's when I put my hands up and [Defendant] pushed my hands." She further explained, "Not pushed. He just moved me gently." The remaining flaw noted during Mrs. Thompson's testimony concerned the statement: "No one else had come to the house except police and EMS." At trial, Mrs. Thompson corrected her account to include that two other family members came into the Thompson residence to administer CPR on Mr. Thompson.

After the events on 19 August 2019, Defendant was transported to the Cabarrus County Sheriff's Office and interviewed by Detective Chris Smith. That interview was recorded. It was received into evidence by the trial court and played on a television for the jury's viewing. Defendant's interview tended to show: Mr. and Mrs. Thompson married shortly after Defendant's biological father had passed away. After Mr. and Mrs. Thompson married, they resided in Defendant's childhood home— the Thompson residence. On 19 August 2019, a bright light from next door was shining in Defendant's house. Defendant went to the Thompson residence and knocked on the door to request that the light be turned off. In conformity with Mrs. Thompson's testimony, Defendant stated he had a .25 caliber pistol concealed in his pocket. Mr. Thompson answered the door with two .380 caliber handguns holstered on either side of his person. Defendant stated Mr. Thompson carried one or two firearms "all the time." He claimed, "it's a normal thing for [Mr. Thompson] to carry pistols on both sides like a damn cowboy."

Since Mrs. Thompson initially did not hear anything, the only account of the events leading to Mr. Thomspon retrieving a third firearm come from Defendant:

> [DEFENDANT]: I went up there and I knock on the door.
>
> DETECTIVE SMITH: Side door over by the carport?
>
> [DEFENDANT]: Yeah, by the carport. [H]e come out, can I help you? I said, can you please turn I said, it's the same thing. I said, you do that to antagonize me and piss me off because you want some kind of reaction. I said, just turn the lights off please. And then, well you need to leave, you need to get out of my house. I said, I'm standing on the step outside your door.
>
> DETECTIVE SMITH: Out in the carport.
>
> [DEFENDANT]: On the carport.
>
> DETECTIVE SMITH: Okay.
>
> [DEFENDANT]: I said, and plus, I got verbal confirmation from my mother to be here because you know, I've been here longer than you . . . . I understand you're married to my mom or whatever, but this is my childhood home. I said, can you please turn the lights off or go get mom and let me talk to her. At least she can talk to you. So . . . he shut the door and I went to try to leave and the door opened up again. He come out, you better not try to come in here. . . . He wears like a gun here, two guns here or one and two and this and that.
>
> DETECTIVE SMITH: All that regular--
>
> [DEFENDANT]: All the time.
>
> DETECTIVE SMITH: Okay.
>
> . . .
>
> [DEFENDANT]: So, I was talking to my mom and when she came to the door and he disappeared and when he came

- 7 -

back, he was brandishing a handgun in his hand.

After Mrs. Thompson arrived at the door, Defendant recalled:

> [DEFENDANT]: Well, [Mr. Thompson] . . . walked up behind her with the gun and [ ]he's like, you better get him outta here, I'm gonna shoot him. . . .
>
> . . .
>
> [DEFENDANT]: [W]henever [Mr. Thompson] said, get him outta here, I'm gonna shoot him. [Mrs. Thompson's] like, put your gun up, he's got one too. [Mr. Thompson's] like, I'm gonna shoot him. And when [Mr. Thompson] said that, I mean, he's standing behind my mom. And –
>
> DETECTIVE SMITH: How many times did you shoot?
>
> [DEFENDANT]: Once.

Defendant stated he was in fear for his life and his mother's life because Mr. Thompson "had the gun in his hand behind her back." He elaborated, Mr. Thompson "has threatened me multiple times . . . and I was in fear for my life." Defendant also said, "I never wanted to hurt [Mr. Thompson] and I don't think [Mr. Thompson] ever wanted to hurt me." Defendant explained that his gun remained concealed in his pocket. But Defendant saw Mr. Thompson openly "brandish[ ] his weapon" and his "arm moving." In response, Defendant fired a shot toward Mr. Thompson. Defendant maintained he "never opened the door," "never went into" the Thompson residence, and "never tried to force [his] way in or anything like that." He "turned and walked off because . . . if [Mr. Thompson] was gonna shoot back, [he] wasn't gonna hang around and wait for it." Defendant's wife then called 911 to report the incident and

he placed his weapon on the tailgate of his truck because he "tried to get prepared and be respectful."

During Defendant's trial, he moved to dismiss the second-degree murder charge at the close of the State's evidence, arguing that it had not presented sufficient evidence. The trial court denied Defendant's motion. Defendant renewed his motion to dismiss at the end of all evidence. His motion was again denied. The trial court instructed the jury on second-degree murder and voluntary manslaughter. It also instructed the jury on self-defense. Over Defendant's objection during the charge conference, the trial court instructed the jury on the aggressor doctrine. After deliberating, the jury found Defendant guilty of second-degree murder. The jury's verdict sheet does not show whether the jury disbelieved Defendant had acted in self-defense, or thought he was the aggressor. Instead, it simply shows a check mark by the selection of guilty of second-degree murder. For his conviction of the B1 felony and having no prior criminal record, the trial court sentenced Defendant to a minimum term of imprisonment of 220 months and maximum term of 276 months. Defendant entered his notice of appeal in open court.

## II.    Jurisdiction

This Court has jurisdiction to consider Defendant's appeal pursuant to N.C. Gen. Stat. §§ 7A-27(b)(1) (2023) ("From any final judgment of a superior court . . . .") and 15A-1444(a) (2023) ("A defendant who has entered a plea of not guilty to a

criminal charge, and who has been found guilty of a crime, is entitled to appeal as a matter of right when final judgment has been entered.").

## III. Analysis

Defendant first argues the State presented insufficient evidence allowing the trial court to submit the charge of second-degree murder to the jury. Defendant next argues the trial court committed error by instructing the jury on the aggressor doctrine because insufficient evidence supports the inference that he was the aggressor.

## A. Motion to Dismiss

Defendant contends the trial court erroneously denied his motion to dismiss because the State presented insufficient evidence as to the elements of second-degree murder. More specifically, Defendant maintains the State's evidence is insufficient to demonstrate that he unlawfully shot and killed Mr. Thompson because he acted in self-defense. After careful consideration, we disagree.

"Whether the State presented substantial evidence of each essential element of the offense is a question of law; therefore, we review the denial of a motion to dismiss de novo." *State v. Crockett*, 368 N.C. 717, 720, 782 S.E.2d 878, 881 (2016). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *State v. Clemons*, 274 N.C. App. 401, 409, 852 S.E.2d 671, 676 (2020) (citation omitted).

"Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." *State v. Fritsch*, 351 N.C. 373, 378, 526 S.E.2d 451, 455 (2000). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78–79, 265 S.E.2d 164, 169 (1980). If the record contains "substantial evidence, whether direct or circumstantial, or a combination, 'to support a finding that the offense charged has been committed and that the defendant committed it, the case is for the jury and the motion to dismiss should be denied.'" *State v. Winkler*, 368 N.C. 572, 575–76, 780 S.E.2d 824, 826 (2015) (quoting *State v. Locklear*, 322 N.C. 349, 358, 368 S.E.2d 377, 383 (1988)). But, if "the evidence raises no more than a suspicion of guilt, a motion to dismiss should be granted." *State v. Bradshaw*, 366 N.C. 90, 93, 728 S.E.2d 345, 347 (2012) (citation omitted).

"In ruling on a motion to dismiss, the trial court must view all of the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn from the evidence." *State v. McAllister*, 138 N.C. App. 252, 259, 530 S.E.2d 859, 864 (2000). In determining whether evidence is substantial, a court must apply the following test:

> The trial court is not required to determine that the evidence excludes every reasonable hypothesis of innocence prior to denying the defendant's motion to

> dismiss. The test of the sufficiency of the evidence to withstand the motion is the same whether the evidence is direct, circumstantial or both. That test is whether a reasonable inference of the defendant's guilt may be drawn from the evidence. If so the evidence is substantial and the defendant's motion to dismiss must be denied.

*State v. Malloy*, 309 N.C. 176, 178–79, 305 S.E.2d 718, 720 (1983) (internal citations omitted).

"Second-degree murder is defined as '(1) the unlawful killing, (2) of another human being, (3) with malice, but (4) without premeditation and deliberation.'" *State v. Arrington*, 371 N.C. 518, 523, 819 S.E.2d 329, 332 (2018) (citation omitted). Second-degree murder is "a general intent crime." *State v. Coble*, 351 N.C. 448, 449, 527 S.E.2d 45, 46 (2000). "General-intent crimes are crimes which only require the doing of some act." *State v. Oakman*, 191 N.C. App. 796, 800, 663 S.E.2d 453, 457 (2008) (citation omitted). "Intent to kill is not a necessary element of second-degree murder, but there must be an intentional act sufficient to show malice." *State v. Rich*, 351 N.C. 386, 395, 527 S.E.2d 299, 304 (2000) (quoting *State v. Brewer*, 328 N.C. 515, 522, 402 S.2.2d 380, 385 (1991)).

Defendant contends he had a reasonable belief it was necessary to kill Mr. Thompson to prevent death or great bodily harm to himself. *E.g., State v. Hamilton*, 77 N.C. App. 506, 513, 335 S.E.2d 506, 510–11 (1985) ("Of the . . . elements of murder and voluntary manslaughter, only the unlawfulness of the killing is seriously disputed here. Defendant's contention is that the killing was justified as a matter of

law by self-defense . . . ."). "A person who kills another is not guilty of murder if the killing was an act of self[-]defense." *Id.* "The concept of self-defense emerged in the law as a recognition of a 'primary impulse' that is an 'inherent right' of all human beings." *State v. Moore*, 363 N.C. 793, 796, 688 S.E.2d 447, 449 (2010) (citation omitted). North Carolina recognizes two types of self-defense: perfect and imperfect. *State v. Reid*, 335 N.C. 647, 670, 440 S.E.2d 776, 789 (1994).

Perfect self-defense applies "when the evidence presented at trial tends to show that, at the time of the killing":

> (1) it appeared to defendant and he believed it to be necessary to kill the deceased in order to save himself from death or great bodily harm; and
>
> (2) defendant's belief was reasonable in that the circumstances as they appeared to him at the time were sufficient to create such a belief in the mind of a person of ordinary firmness; and
>
> (3) defendant was not the aggressor in bringing on the affray, i.e., he did not aggressively and willingly enter into the fight without legal excuse or provocation; and
>
> (4) defendant did not use excessive force, i.e., did not use more force than was necessary or reasonably appeared to him to be necessary under the circumstances to protect himself from death or great bodily harm.

*State v. Harvey*, 372 N.C. 304, 307–08, 828 S.E.2d 481, 483 (2019) (citations omitted); *see also State v. Kirby*, 206 N.C. App. 446, 452–53, 697 S.E.2d 496, 500–01 (2010) (providing the elements of perfect self-defense because the defendant argued "the

trial court erred by denying his motion to dismiss the charge of second-degree murder . . . on the ground that he acted in self-defense").

"The doctrine of imperfect self-defense applies when the evidence supports a determination that only the first two elements in the preceding quotation existed at the time of the killing, in which case the defendant would be guilty of the lesser included offense of voluntary manslaughter." *Harvey*, 372 N.C. at 308, 828 S.E.2d at 484 (citation omitted); *see also State v. Hairston*, 269 N.C. App. 52, 56–57, 837 S.E.2d 157, 162 (2019) (providing the elements of imperfect self-defense because the defendant argued "that the evidence warranted dismissal under the doctrine of self-defense").

"[A]fter the General Assembly's enactment of N.C. [Gen. Stat.] § 14-51.3, there is only one way a criminal defendant can claim perfect self-defense: by invoking the statutory right to perfect self-defense." *McLymore*, 380 N.C. at 191, 868 S.E.2d at 72. Indeed, "[s]ection 14-51.3 supplants the common law on all aspects of the law of self-defense addressed by its provisions." *Id.* "Therefore, when a defendant in a criminal case claims perfect self-defense, the applicable provisions of N.C. [Gen. Stat.] § 14-51.3—and, by extension, the disqualifications provided under [Gen. Stat.] § 14-51.4—govern." *Id.* at 191, 868 S.E.2d at 73. That said, "[s]ection 14-51.3 closely tracks th[e] earlier common law definition of the right to self-defense in providing that an individual may use force 'against another when and to the extent that the person reasonably believes that the conduct is necessary to defend himself or herself

or another against the other's imminent use of unlawful force.'" *Id.* at 191, 868 S.E.2d at 72 (citation omitted).

In the context of murder and voluntary manslaughter, when self-defense is asserted, "[t]he State bears the burden of proving that [the] defendant did not act in self-defense." *Hamilton*, 77 N.C. App. at 513, 335 S.E.2d at 511; *see also State v. Herbin*, 298 N.C. 441, 445, 259 S.E.2d 263, 267 (1979); *see also State v. Ammons*, 167 N.C. App. 721, 725, 606 S.E.2d 400, 403 (2005). "To survive a motion to dismiss, the State must therefore present sufficient substantial evidence which, when taken in the light most favorable to the State, is sufficient to convince a rational trier of fact that defendant did not act in self-defense." *Hamilton*, 77 N.C. App. at 513, 335 S.E.2d at 511; *see also Kirby*, 206 N.C. App. at 453, 697 S.E.2d at 501; *see also State v. Madonna*, 256 N.C. App. 112, 116, 806 S.E.2d 356, 361 (2017); *see also State v. Presson*, 229 N.C. App. 325, 329, 747 S.E.2d 651, 655 (2013); *see also Ammons*, 167 N.C. App. at 725, 606 S.E.2d at 403.

Here, Mrs. Thompson's testimony and statement, and certain portions of Defendant's interview, may have established he reasonably believed it to be necessary to kill Mr. Thompson to save himself or Mrs. Thompson from death or great bodily harm. *See Harvey*, 372 N.C. at 307–08, 828 S.E.2d at 483; *see also McLymore*, 380 N.C. at 191, 868. S.E.2d at 72. Yet other evidence tended to show a discrepancy in Defendant's contention that he had a reasonable belief of the necessity to kill Mr. Thompson. For example, sometime during his interview with Detective Smith,

Defendant stated Mr. Thompson "has threatened me multiple times . . . and I was in fear for my life." But Defendant also stated during the interview, "I don't think [Mr. Thompson] ever wanted to hurt me."

Our precedents establish contradictions or discrepancies are best left for resolution by the jury. *See Fritsch*, 351 N.C. at 379, 526 S.E.2d at 455 ("Contradictions and discrepancies do not warrant dismissal of the case but are for the jury to resolve."); *see also Malloy*, 309 N.C. at 179, 305 S.E.2d at 720 ("[C]ontradictions and discrepancies are to be resolved in favor of the State."); *see also State v. Revels*, 153 N.C. App. 163, 168, 569 S.E.2d 15, 18 (2002) ("The evidence offered by defendant provided a conflicting account of what occurred and indicated that defendant acted in self-defense. However, contradictions in the evidence remain for the jurors to resolve."). "In 'borderline' or close cases, our courts have consistently expressed a preference for submitting issues to the jury, both in reliance on the common sense and fairness of the twelve and to avoid unnecessary appeals." *Hamilton*, 77 N.C. App. at 512, 335 S.E.2d at 510 (citations omitted); *see also State v. Yisrael*, 255 N.C. App. 184, 193, 804 S.E.2d 742, 747 (2017).

Viewing the evidence in the light most favorable to the State, a juror could reasonably infer that Defendant did not "believe[ ] it to be necessary to kill the deceased in order to save himself from death or great bodily harm." *Harvey*, 372 N.C. at 307–08, 828 S.E.2d at 483 (citation omitted)*; see also McLymore*, 380 N.C. at 191, 868. S.E.2d at 72. We thus hold the State presented substantial evidence to survive

Defendant's motion to dismiss. *Hamilton*, 77 N.C. App. at 513, 335 S.E.2d at 511. Defendant's argument on this ground is overruled.

## B. Jury Instructions

Defendant argues the trial court erroneously instructed the jury on the aggressor doctrine. In particular, Defendant maintains the inclusion of the aggressor doctrine amounts to reversible error because the State presented insufficient evidence that he was the initial aggressor, and as a result, he suffered prejudice. *See* N.C. Gen. Stat §§ 14-51.4 and 15A-1443(a) (2023). Having meticulously considered the evidence, in a light most favorable to the State, we agree.

### *1. Standard of review*

"It is the duty of the trial court to instruct the jury on all substantial features of a case raised by the evidence." *State v. Shaw*, 322 N.C. 797, 803, 370 S.E.2d 546, 549 (1988). "Where a defendant properly objects at trial to jury instructions, a defendant's arguments 'challenging the trial court's decisions regarding jury instructions are reviewed *de novo* by this Court.'" *State v. Scarboro*, 287 N.C. App. 184, 186, 882 S.E.2d 139, 142 (2022) (citation omitted). "Under a *de novo* review, the court considers the matter anew and freely substitutes its own judgment for that of the lower tribunal." *Clemons*, 274 N.C. App. at 409, 852 S.E.2d at 676 (citation omitted).

"Additionally, we review such challenges for harmless error." *State v. Pierre*, 269 N.C. App. 90, 94, 837 S.E.2d 151, 154 (2019); *see also State v. Leaks*, 379 N.C. 57,

61, 864 S.E.2d 217, 220 (2021) ("When a party properly preserves an objection to a jury instruction, appellate courts review the instruction for harmless error pursuant to N.C. [Gen. Stat.] § 15A-1443(a)."). To that end, our Supreme Court previously determined:

> As a general proposition, a defendant seeking to obtain appellate relief on the basis of an error to which he or she lodged an appropriate contemporaneous objection at trial must establish that "there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at the trial out of which the appeal arises." However, the history of this Court's decisions in cases involving the submission of similar erroneous instructions and our consistent insistence that jury verdicts concerning a defendant's guilt or innocence have an adequate evidentiary foundation persuade us that instructional errors like the one at issue in this case are exceedingly serious and merit close scrutiny to ensure that there is no "reasonable possibility" that the jury convicted the defendant on the basis of such an unsupported legal theory.

*State v. Malachi*, 371 N.C. 719, 738, 821 S.E.2d 407, 421 (2018) (quoting N.C. Gen. Stat. § 15A-1443(a)).

At trial, Defendant objected to the inclusion of the aggressor doctrine in the instructions submitted to the jury. In doing so, he argued the evidence offered was insufficient to support the inference he was the aggressor and preserved his objection. Accordingly, we proceed with harmless error review. *See Leaks*, 379 N.C. at 61, 864 S.E.2d at 220; *see also Malachi*, 371 N.C. at 738, 821 S.E.2d at 421.

### 2. The Aggressor Doctrine

"[T]he defenses pursuant to N.C. [Gen. Stat.] §§ 14-51.2 and 14-51.3 '[are] not available to someone who [i]nitially provokes the use of force against himself or herself.' This is what is commonly known as the aggressor doctrine." *Hicks*, 385 N.C. at 60, 891 S.E.2d at 241 (second and third brackets in original) (quoting N.C. Gen. Stat. § 14-51.4 (2021)). Put another way, "[t]he aggressor doctrine provides that a defendant may not receive the benefit of self-defense if he was the aggressor." *State v. Lee*, 258 N.C. App. 122, 126, 811 S.E.2d 233, 236 (2018). A defendant is properly classified as an aggressor if he "aggressively and willingly enter[s] into the fight without legal excuse or provocation[.]" *State v. Norris*, 303 N.C. 526, 530, 279 S.E.2d 570, 572 (1981). A defendant may also be considered an aggressor if there is "evidence from which the jury could find that defendant voluntarily entered a fight with the deceased based on her use of abusive language calculated to bring on such a fight . . . ." *State v. Temples*, 74 N.C. App. 106, 109, 327 S.E.2d 266, 268 (1985). Indeed, "a person is entitled under the law of self-defense to harm another only if he is 'without fault in provoking, or engaging in, or *continuing a difficulty with another.*'" *State v. Hunter*, 315 N.C. 371, 374, 338 S.E.2d 99, 102 (1986) (citation omitted).

"In determining whether a self-defense instruction should discuss the aggressor doctrine, the relevant issue is simply whether the record contains evidence from which the jury could infer that the defendant was acting as an aggressor at the time that he or she allegedly acted in self-defense." *Mumma*, 372 N.C. at 239 n.2,

827 S.E.2d at 297 (citation and internal quotation marks omitted). "[T]he evidence must be considered in the light most favorable to the State. The State must be given the benefit of every reasonable inference to be drawn from the evidence and any contradictions in the evidence are to be resolved in favor of the State." *Hicks*, 385 N.C. at 61, 891 S.E.2d at 241 (citations omitted).

When assessing which party was the aggressor, our courts consider a battery of different factors, "including the circumstances that precipitated the altercation; the presence or use of weapons; the degree and proportionality of the parties' use of defensive force; the nature and severity of the parties' injuries; or whether there is evidence that one party attempted to abandon the fight." *State v. Corbett*, 269 N.C. App. 509, 566, 839 S.E.2d 361, 403 (2020) (citations omitted). "When there is no evidence that a defendant was the initial aggressor, it is reversible error for the trial court to instruct the jury on the aggressor doctrine of self-defense." *State v. Juarez*, 369 N.C. 351, 358, 794 S.E.2d 293, 300 (2016). But "[w]hen there is conflicting evidence as to which party was the aggressor, the jury, as the finders of fact, are . . . entitled to determine which of the parties, if either, is the aggressor." *Lee*, 258 N.C. App. at 127, 811 S.E.2d at 237 (citation omitted).

The previous decisions of our courts demonstrate an inquiry of this nature is fact-intensive, and our analysis thus rests on what a juror could reasonably infer from the record evidence. *See Hicks*, 385 N.C. at 61–62, 891 S.E.2d at 242 ("Properly viewed, the record contained significant evidence from which the jury could

reasonably infer that [the defendant] acted as the aggressor."); *see also State v. Vaughn*, 227 N.C. App. 198, 204, 742 S.E.2d 276, 280 (2013) ("[W]e hold that the evidence presented at trial was insufficient to support the [aggressor] instruction . . . ."); s*ee also Corbett*, 269 N.C. App. at 573, 839 S.E.2d at 407 ("In the instant case, the undisputed evidence—viewed in the light most favorable to the State—simply does not support that anyone but [the decedent] was the aggressor in the altercation on 2 August 2015."). Here, we are tasked with determining whether the record contains sufficient evidence from which the jury could infer Defendant was acting as an aggressor at the time he allegedly acted in self-defense. *Mumma*, 372 N.C. at 239 n.2, 827 S.E.2d at 297.

Here, Mrs. Thompson's testimony tended to show: (1) although both parties were armed at the start of the encounter, Mr. Thompson was the only person to brandish a firearm after he retrieved his revolver from the bedroom; (2) Mr. Thompson uttered the phrase "shoot" or "shooting" towards Defendant before Defendant discharged his weapon; (3) after being shot, but before collapsing, Mr. Thompson's revolver was raised in Defendant's direction; and (4) when Mrs. Thompson went to Mr. Thompson's aid after he collapsed, she found his finger inside "the trigger well," and "he was holding [the gun] as tight as he could."

As to Defendant's recorded interview, the evidence tends to show: (1) Mr. Thompson was the first person to introduce a deadly weapon to the conversation; (2) Defendant introduced his firearm *after* Mr. Thompson retrieved the .44 caliber

revolver from the bedroom and brandished it; (3) after retrieving the .44 caliber revolver, Mr. Thompson verbally threatened Defendant by stating to Mrs. Thompson, "you better get him outta here, I'm gonna shoot him"; and (4) Defendant only fired his weapon at Mr. Thompson after he saw Mr. Thompson's "hand moving in an upward position" while holding the .44 caliber revolver.

Considering factors employed by our Courts, the evidence is insufficient to permit a juror to infer that Defendant was the aggressor when he shot Mr. Thompson. *Corbett*, 269 N.C. App. at 566, 839 S.E.2d at 403. Defendant's statement and Mrs. Thompson's testimony establish that Mr. Thompson first brandished a weapon, the .44 caliber revolver, and raised his arm after uttering the phrase "shoot" or "shooting." This evidence supports the inference that the only party to threaten the use of a weapon was Mr. Thompson. *See id.* It also shows that Mr. Thompson "precipitated the altercation," and Defendant fired his weapon in response to Mr. Thompson's escalation. *See id.* Finally, from these facts, a juror could also infer that Defendant's resulting use of defensive force was proportional—having fired only once. *See id.* Without evidence tending to show Defendant was the aggressor, the trial court's aggressor jury instruction was in error. *Mumma*, 372 N.C. at 239 n.2, 827 S.E.2d at 297.

The State argues the evidence supported the inference that Defendant was the aggressor since Defendant showed up at the Thompson residence armed and

uninvited, argued with Mr. Thompson, and refused to leave despite being asked on several occasions. We are unpersuaded.

The evidence shows throughout the disagreement, Mrs. Thompson stepped in, and Defendant repeatedly expressed a desire to converse only with her. Although the parties disagreed over the light, and even argued, no evidence supports the inference that Defendant used "abusive language" that was calculated for the purposes of bringing on a fight. *Temples*, 74 N.C. App. at 109, 327 S.E.2d at 268. When Mr. Thompson refused to turn off the light, Defendant responded, "just . . . get [Mrs. Thompson]. . . . I don't want to talk to you anymore, I wanna talk to my Momma." Contrary to the State's arguments, the record evidence does not support the inference that Defendant "provoke[d] the use of force" against himself. *Hicks*, 385 N.C. at 60, 891 S.E.2d at 241 (citation and quotation marks omitted).

Although Defendant was armed with a two-shot .25 caliber derringer in his pocket when he approached the Thompson residence, Defendant never exposed the firearm or threatened to use it. Our courts have previously determined the mere possession of a firearm, standing alone, is not evidence that a defendant was the aggressor in the affray. *See Corbett*, 269 N.C. App. at 569, 839 S.E.2d at 405 ("The mere fact that a defendant was armed is not evidence that he was the aggressor if he made no unlawful use of his weapon."); *see also State v. Alston*, 228 N.C. 555, 557, 46 S.E.2d 567, 568 (1948) (awarding a new trial because "the fact that the defendant had a pistol in his pocket, but had made no unlawful use of it prior to the attack upon him

by the deceased, would not deprive the defendant of his legal right of self-defense."); *see also State v. Tann*, 57 N.C. App. 527, 531, 291 S.E.2d 824, 827 (1982) ("The [S]tate urges upon us that defendant, who anticipated the confrontation, armed himself with a .38 caliber pistol, and failed to avoid the fight, was somehow responsible for causing the altercation. These observations do not in any way suggest that defendant was the provocator, however."); *see also Vaughn*, 227 N.C. App. at 203, 742 S.E.2d at 279–80 ("Defendant's decision to arm herself and leave the vehicle, while perhaps unwise, was not, in and of itself, evidence that she brought on the difficulty, 'aggressively and willingly' entered the fight, or intended to continue the altercation.").

Viewing all of the evidence in the light most favorable to the State, we hold that the trial court erred by instructing the jury on the aggressor doctrine. *See Hicks*, 385 N.C. at 61, 891 S.E.2d at 241. The only available evidence to determine whether Defendant was the aggressor comes from Defendant's recorded interview, Mrs. Thompson's written statement, and Mrs. Thompson's testimony at trial. Since the evidence does not tend to show Defendant using abusive language, seeking the fight, or precipitating the altercation, the trial court's instruction of the aggressor doctrine instruction was erroneous. *See Corbett*, 269 N.C. App. at 566, 839 S.E.2d at 403.

### *3. Prejudice*

In final support of his contention, Defendant submits that "had the jury instructions [omitted] the aggressor language, there is a reasonable possibility that the jury would have reached a different result." Our previous decision in *State v.*

*Tann* is particularly instructive on the issue of prejudice as it relates to an erroneous aggressor doctrine instruction. 57 N.C. App. 527, 291 S.E.2d 824.

In that case, the defendant "was tried for assault with a deadly weapon inflicting serious injury" after he shot the victim twice during an altercation. *Id.* at 528, 291 S.E.2d at 826. On appeal, the defendant contended that the trial court "erred in its instructions to the effect that self[-]defense was unavailable to the defendant if he was the aggressor." *Id.* at 530, 291 S.E.2d at 827. The defendant explained that the evidence offered tended to support the inference that another person was "the initial assailant." *Id.* In rebuttal, the State argued that the defendant, "who anticipated the confrontation, armed himself with a .38 caliber pistol, and failed to avoid the fight, was somehow responsible for causing the altercation." *Id.* at 531, 291 S.E.2d at 827.

Our Court agreed with the defendant and held that the evidence did not support the inference that he had started the fight. *Id.* at 530, 291 S.E.2d at 827. As to the State's argument, the Court determined that possessing a firearm does "not in any way suggest that defendant was the provocator . . . ." *Id.* at 531, 291 S.E.2d at 827. The Court noted that although the defendant received "an instruction on self[-]defense," he was "prejudiced by the further instruction that he could not avail himself of the doctrine of self[-]defense if he . . . used excessive force *or was the aggressor*." *Id.* (citation omitted). The Court concluded the defendant had suffered prejudice because "it could not be assumed 'that the jury was more discriminating

than the judge and ignored the erroneous instruction while applying the correct one.'" *Id.* (quoting *State v. Ward*, 26 N.C. App. 159, 163, 215 S.E.2d 394, 397 (1975)). Consequently, the Court awarded the defendant a new trial. *Tann*, 57 N.C. App. at 532, 291 S.E.2d at 827.

Here, Defendant requested that the trial court omit similar language from its instruction to the jury as did the defendant in *Tann*: "The defendant is not entitled to the benefit of self-defense if the defendant was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased." "We have long held that a jury is presumed to follow the instructions given to it by the trial court." *State v. Wiley*, 355 N.C. 592, 637, 565 S.E.2d 22, 52 (2002). As in *Tann*, we cannot "assume[ ] 'that the jury was more discriminating than the judge and ignored the erroneous instruction while applying the correct one.'" 57 N.C. App. at 531, 291 S.E.2d at 827 (quoting *Ward*, 26 N.C. App. at 163, 215 S.E.2d at 397).

We also note the jury's verdict sheet does not indicate whether it determined Defendant was guilty of second-degree murder because it disbelieved Defendant had acted in self-defense, or thought he was the aggressor. If the jury determined Defendant did not act in self-defense and did not consider the aggressor doctrine, then the verdict could stand because there would be no prejudice to Defendant. However, the record contains no indication whether the jury concluded, in the alternative, Defendant acted in self-defense but was the aggressor. If the jury concluded Defendant was the aggressor, it would be unable to reach the issue of self-defense

given the language included in the instructions: "The defendant is not entitled to the benefit of self-defense if the defendant was the aggressor with the intent to kill or inflict serious bodily harm upon the deceased." Defendant was thus prejudiced by the trial court's inclusion of an aggressor instruction. *See Vaughn*, 227 N.C. App. at 204, 742 S.E.2d at 280 (citation omitted) ("[B]ecause it cannot be assumed 'that the jury was more discriminating than the judge and ignored the erroneous instruction while applying the correct one,' we hold that the court's error was prejudicial and award a new trial."). Accordingly, we vacate the trial court's judgment, entered on Defendant's conviction of second-degree murder, and remand for a new trial not inconsistent with this opinion. *See State v. Lee*, 370 N.C. 671, 677, 811 S.E.2d 563, 567 (2018) ("Accordingly, we reverse the decision of the Court of Appeals and remand this case . . . with instructions to vacate [the] defendant's conviction and further remand this case to the trial court for a new trial with proper instructions . . . .").

## IV. Conclusion

We hold the trial court did not commit prejudicial error by denying Defendant's motion to dismiss the charge of second-degree murder. However, since the record does not contain evidence from which the jury could infer Defendant was the aggressor, the trial court erroneously instructed the jury on the aggressor doctrine. Further, since we cannot ascertain whether the jury considered Defendant the aggressor, we vacate the judgment entered upon the jury's verdict against Defendant and remand for a new trial.

NEW TRIAL.

Panel consisting of:

Judges TYSON, WOOD, and STADING.

Report per Rule 30(e).